HEATHER S., by her natural parent
and next friend, KATHY S.,
Plaintiff–Appellant,

v.

STATE OF WISCONSIN, John T.
Benson, Juanita Pawlisch, et
al., Defendants–Appellees.

No. 96–3340.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 26, 1997.

Decided Sept. 16, 1997.

Ronald S. Stadler (argued), Patricia N. Engel, Stadler & Schott, Brookfield, WI, for Plaintiff–Appellant.

Mary Woolsey Schlaefer (argued), Office of the Attorney General, Wisconsin Department of Justice, Madison, WI, for Defendants–Appellees State of Wisconsin, John T. Benson, Juanita Pawlisch.

William Sosnay (argued), Jane M. Knasinski, Davis & Kuelthau, Milwaukee, WI, for Defendants–Appellees Pewaukee School District, Lee Wille, Mary Cimbalnik.

Before EASTERBROOK, RIPPLE, and MANION, Circuit Judges.

MANION, Circuit Judge.

Kathy S., on behalf of her daughter Heather S., a minor with disabilities, challenges both the substantive and procedural adequacy of the educational opportunities offered her by the Pewaukee, Wisconsin, School District. The district court granted summary judgment to the state and school district defendants after determining that the district had complied with the Individuals with Disabilities Education Act (IDEA)[1] when it assessed Heather's education needs and devised what is called an individualized education program (IEP). The court determined that the school district had offered Heather a free and appropriate education within the meaning of the statute. The court also determined that Heather either had waived the procedural errors about which she complains, or that those errors, if not waived, had not deprived Heather of any substantive rights provided by IDEA. Heather appeals; we affirm.

I.

Heather S. was born on September 24, 1980. In 1984 the Pewaukee School District identified Heather as requiring special education services. From 1984 until this lawsuit was filed in 1995, the district convened eleven M-teams[2] to assess Heather's educational needs and prepared sixteen IEPs. Throughout this time, Heather was classified as learning disabled and enrolled in learning disabilities (LD) programs. In 1988, the district began providing Heather with speech and language services. When Heather was in the third grade, the district added occupational therapy. In 1989, Heather was diagnosed with attention deficit hyperactivity disorder and placed on Ritalin. Also in 1989 she began experiencing seizures which, during the 1992–93 school year, began occurring at school. During her three-year reevaluation at the end of the 1989–90 school year, an M-team again identified Heather's primary handicapping condition as learning disabled and recommended continued speech, language, and occupational therapy. Heather began receiving services for visual impairment during the 1991–92 school year. Throughout this period, Heather's parents were satisfied with her placement in the LD program at Pewaukee and disputed neither the M-team assessments nor the resulting IEPs.

During the 1992–93 school year, while enrolled in the sixth grade at Pewaukee Middle School, Heather's seizures escalated in frequency and intensity. She experienced increasing difficulty with academics and with her relationships with classmates. An M-team convened on May 17, 1993 to assess Heather in preparation for her entry into seventh grade. A majority of the team

1. 20 U.S.C. § 1400 et seq. (1997). The IDEA was recently amended by Congress. See Individuals with Disabilities Education Act Amendments of 1997, P.L. No. 105–17, June 4, 1997, 11 Stat. 37. Because all of the events giving rise to this action occurred before the enactment of the amendments, we need not consider their effect in this appeal. Accordingly, unless noted, all references to IDEA provisions are to the law as it stood at the time the school district, the hearing officers, and the district court were considering Heather's educational opportunities. See Cypress-Fairbanks Independent Sch. Dist. v. Michael F., 118 F.3d 245, 247 n. 1 (5th Cir.1997).

2. Short for "multidisciplinary team," an assessment team made up of teachers, learning disability teachers, clinicians, therapists, psychologists, and/or others with knowledge in the area of a student's disability who must meet to develop, review, and revise that student's IEP. See 34 C.F.R. §§ 300.343, .344, .345, and .532(e).

agreed that Heather no longer met the criteria for learning disabled. Mary Roberts, director of student services, did not approve the M-team's report and returned the matter to them for further consideration, including consideration of whether Heather met the criteria for "other health impaired."[3] At the insistence of her parents, Heather was not tested for cognitive disabilities.

The M-team reconvened on June 2, 1993, at which time its members concluded that Heather's primary handicapping condition was other health impaired. An IEP was developed on June 8, and a placement offered on June 10 which proposed educating Heather in a borderline cognitive disability program at the Richmond School:

> Heather's continuing medical complications adversely affect her ability to process, organize, and recall previous and current learned information that prevents academic growth. Heather is in need of a more individualized and specialized educational program that will take into account her handicapping conditions and attempt to work successfully at increasing her knowledge base and social/adaptive behaviors. Her needs can be most appropriately addressed in a cognitive disability-borderline program designed to focus on her current academic and social/adaptive levels.

Heather's parents disagreed with the assessment and appealed the IEP and the offered placement on August 16, 1993. They believed Heather should remain in a modified LD program. In response to the appeal, another IEP meeting was held on August 27 and an IEP developed which provided for the "stayput" provision pending resolution of the dispute over the IEP and the Richmond School placement.[4]

Heather thereby remained in the combined self-contained integrated learning disabled program and regular education classes in which she was already placed.

Heather's parents arranged for an independent evaluation of Heather and agreed to hold the hearing process in abeyance so that the results of the evaluation might be considered in the development of an amended IEP or reconsideration of the Richmond placement offer. The M-team reconvened on September 27. It was comprised of ten staff members who had experience with Heather: Gayle Best and Joanne Reinfeldt, learning disabilities teachers; Lynn Goeden–Hough, a visual impairment specialist; Kate Morand, a speech and language pathologist; Leslee Jepson, an occupational therapist; Jeff Mamerow, a tech ed instructor; Carrie Sauld, a specially designed physical education instructor; Amy Farrow, a guidance counselor; Susan Behnke, a choir teacher; and Dennis Cahn, a school psychologist. There were several other people present as observers, including Mary Roberts, director of student services, Heather's mother, and Heather's mother's attorney. In addition to all of the evidence they had considered in the past (and their own experiences with Heather), the M-team considered the independent evaluations performed by St. Francis Children's Center which included an auditory-perceptual test and the Woodcock–Johnson tests of cognitive ability. They also considered a psychological test performed by Terrence McGuire, a Pewaukee public schools psychologist, and an occupational therapy evaluation.

The report that came out of the meeting detailed Heather's difficulties with her educational progress in the learning disabilities program. Although she was nominally in 7th

---

**3.** " 'Other Health Impair[ed]' means having limited strength, vitality or alertness, due to chronic or acute health problems such as heart condition, tuberculosis, rheumatic fever, nephritis, asthma, sickle cell anemia, hemophilia, epilepsy, lead poisoning, leukemia or diabetes that adversely affects a child's educational performance." *In the Matter of Heather S.*, State of Wisconsin, October 31, 1995, Second Level Administrative Appeal Decision and Order p.12, n.9 (quoting Department of Public Instruction Information Update, Bulletin 93.13, September 1993).

**4.** The "stay-put" provision of the IDEA, 20 U.S.C. § 1415(e)(3)(A), provides: "[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents or guardian otherwise agree, the child shall remain in the then current educational placement of such child...."

grade the report summarized her educational performance as far below that level:

> Heather's math instructional level is at the 2.6 grade level. Her science curriculum is at the 2.5 level. . . . In English, she is participating in a modified 7th grade curriculum and Heather is having extreme difficulty comprehending concepts that are being presented. According to testing, her instructional level is approximately 3rd grade. In reading, Heather is in the B–2 series of SRA which is approximately 3rd grade level. Modifications in all academic subject areas include: large print books and materials, group instruction of 4–9 members, additional time, use of finger and/or paper to track reading materials, use of large print computer font and/or printing for written work.

The report also summarized health factors influencing Heather's progress:

> . . . Heather has a past and current history of seizure activity. Past reports indicate her seizuring seems to be increasing as well as blackouts. Heather has been on Depicane since last summer with an increasing dosage up the current 1000 mg. Additionally, Phenobarbital has been administered and [Heather's mother] indicates that Heather is also now receiving Ritalin twice a day. The type of "black out" as seen last year has changed in severity and duration. During these current episodes, Heather is either unable to speak, or she speaks incoherently. These episodes last approximately 30–50 seconds with body tremors. Following these episodes, Heather requires time to rest. The symptoms are atypical from previous blackouts last year.

The report described Heather's social behavior:

> Heather tries to initiate relationships with teachers and adults usually in an immature fashion. She continuously interrupts with irrelevant and off-task comments. When adults are seen as an authority figure, Heather shows physical signs of anxiety i.e. tremors, shaking. Heather still has difficulty interacting appropriately with peers. When peers initiate social interaction, there is no reciprocity on Heather's behalf. Because of her social delays, Heather doesn't know how to respond appropriately to her peers either in large or small groups.

The report determined that Heather had exceptional educational needs resulting from "one or more handicapping conditions":

> Based on the review of past and private evaluations, and current testing Heather is identified as a student with exceptional educational need with respect to Other Health Impairment. Additionally, other handicapping conditions include physical and visual impairment and speech or language.

The report concluded that "[a]s a result of her low academic functioning and current medical situation, Heather requires a significantly modified academic program to best meet her educational needs." Except for school psychologist Cahn, every member of the M-team ultimately agreed with and signed the M-team report. Cahn filed a separate report in which he concluded:

> I continue to maintain that Heather presents a consistent profile of a student with stronger verbal reasoning skills with consistent nonverbal/visual processing deficits. Additionally, through observations noted by this examiner and other staff, Heather seems to continue to present as a student who is extremely anxious and insecure about her abilities to function within the school. I am in agreement with other exceptional educational staff members that Heather exhibits identifiable exceptional educational needs and that the combination of all factors makes programming difficult as well as unique. While we can debate the potential or actual scores obtained by Heather on various psychometric assessments, I believe there exist consistent trends and findings that suggest higher level potential. I base my conclusion on past and present data and continue to believe that Heather exhibits characteristics and similar patterns of a student identified as nonverbal learning disabled.

The district designed a new IEP based on the September 27 M-team report, and provided Heather's parents with a new notice of placement on October 12, 1993. The district

determined that based on Heather's other health impaired disability, along with the other disabilities identified in the M-team report, her educational needs could best be provided through the Richmond School. The district proposed providing Heather a program which included: "Cognitive Disability–Borderline (Self-contained Integrated); Speech and Language (Resource/Monitor); Visually Impaired (Itinerant); Occupational Therapy (Itinerant/Consult); Specially Designed Physical Education (Resource)." The district rejected continuing Heather in the LD program in which she was presently placed because her severe academic delays and complex medical condition required "a specially designed program that focuses on concrete functional application of skills that will enable her to progress and achieve educational benefits . . ." The school district explained its reason for the new placement:

> Within the regular education classroom, Heather received modifications to the curriculum and assistance from an instructional aide as well as small group and individualized instruction in the L.D. room. Documented staff observations indicate Heather continues to be frustrated, anxious, and unable to retain and/or generalize new information in these settings. A program with the resources for and emphasis on incorporating functional life skills into an academic setting will better aid Heather to transfer and generalize learned skills. Heather will continue to be mainstreamed with regular education students of her age for an appropriate portion of her school day.

> \*    \*    \*    \*    \*    \*

> The recommendation to reduce movement and transition as well as the numbers of people to whom Heather has to adjust throughout her day can be better met in a smaller school and program which this placement will provide.

> \*    \*    \*    \*    \*    \*

> The opportunity for Heather to socially interact with both age and ability level peers in an academic and social setting designed to meet her complex needs will increase her self-esteem and academic growth.

The placement proposed extending to Heather "all services currently provided," and the "same accessibility to all extracurricular activities." The IEP contained numerous specific goals and objectives in both academic and non-academic skills.

Heather's parents disagreed with the IEP. On October 1, they notified the district that they no longer wished to hold the due process hearing in abeyance. They refused the Richmond placement as well and Heather remained in the learning disabled program pursuant to stay-put provisions, although that program, a severely modified seventh grade level, was modified further with the consent of Heather's parents on August 27, 1993.

In early November, 1993, the parties agreed that the hearing would be conducted before Dr. Eugene Braaksma. Braaksma conducted a prehearing conference on November 23. At the conference the school district requested and was granted an extension of time to prepare for the hearing, which was set for December 20. The hearing concluded February 23, 1994, after 11 days of testimony. The record included 2,647 pages of transcripts, 127 exhibits, and 160 pages of briefs. Post-hearing briefs were due April 15. The parties later agreed to and obtained an extension to May 13, 1994.

Heather's parents withdrew her from the school district as of May 10, 1994, three days before the final briefing in her case. Since she withdrew, the district has received no state or federal aid for Heather's education. Heather's parents did not inform the district where or even if Heather was enrolled in school. In August, the district learned Heather was enrolled in the private Kradwell School in Wauwatosa, Wisconsin when her parents requested that the school district provide transportation for Heather. The district refused, claiming it had no legal responsibility to provide transportation in these circumstances. Two days later, on October 13, Heather's parents requested a due process hearing, claiming that the district was violating IDEA by refusing to provide equitable participation, specifically, by failing to pay for transportation to and from Kradwell.

The district declined to appoint a hearing officer for the request. The Department of Public Instruction concurred with the district, holding that the issues raised in the new request were the same as those contained in the earlier hearing and must be brought before Braaksma, who continued to exercise jurisdiction over the case.

Meanwhile, Dr. Braaksma issued an interim decision on August 18, 1994, calling for the development of an IEP and placement for the 1994–95 school year. On November 15, 1994, six months after the final post-hearing briefs were submitted, he issued his 29–page, single-spaced final decision. The decision held:

1. The Petitioners' claim that the District misidentified Heather's disability when the District identified her primary handicapping condition as Cognitively Disabled is UPHELD.

2. The Petitioners' claim that Heather's right to a Free Appropriate Public Education has been violated under the law due to various procedural errors is hereby DENIED.

3. The Respondent's determination at the June 3, 1993 M-team meeting that Heather's primary handicapping condition is Other Health Impaired is UPHELD.

4. The Petitioners' claim that Heather was discriminated against due to her disability and denied the benefits allowed to disabled persons as outlined under Section 504 of the Rehabilitation Act of 1973 is DENIED.

5. The parties are ordered to convene an IEP meeting in order to establish Heather's educational program based on

   a. her primary handicapping condition being Other Health Impaired (OHI), with additional handicapping conditions being Visual Impairment and Speech and Language.

   b. her placement for the 1994–95 academic year being the self-contained integrated Learning Disabilities program at the Pewaukee Middle School.

6. The Respondent is ordered to submit the IEP to the hearing officer for review within fifteen (15) days from the date of this decision and order. The hearing officer will exercise final review authority to ensure that there is total and complete compliance of Heather's 1994–95 IEP with what has been outlined in this decision.
Findings of Fact, Conclusions of Law and Order pp. 28–29.

Heather's parents filed a notice of appeal on December 27, 1994. The school cross-appealed. On March 9, 1995, both parties requested and agreed to a waiver of the time limits due to the extensive record. The Department of Public Education appointed review officer Henry J. Plum to hear the appeal. Plum established a briefing schedule estimating his decision would be issued by June 30, 1995. On May 26, Plum informed the parties he would need more time. The parties apparently agreed. On August 22, Plum requested that each party supplement the record with copies of case authority. Plum finally issued his 36–page opinion on October 31, 1995. Plum held:

1. Hearing Officer Braaksma did not err when he determined that Heather S.'s (the Child's) primary handicapping condition was Other Health Impaired.

2. Hearing Officer Braaksma erred when he found that the district mislabeled the Child's disability as cognitive disabled.

3. Hearing Officer Braaksma did not err when he determined that the Child's right to a Free and Appropriate Public Education had not been violated under the Law.

4. Hearing Officer Braaksma did not err when he determined that the Child had not been discriminated against due to her disability and had not been denied the benefits allowed to disabled persons as outlined under section 504 of the rehabilitation act of 1973.

5. Hearing Officer Braaksma did not exceed his authority in retaining jurisdiction ordering an IEP and placement after he issued his final order.

6. Hearing Officer Braaksma did err when he ordered that the Child should be placed in a self-contained integrated learning disabilities program at the Pewaukee Middle School. Therefore the Child is ordered to be placed in a CD Borderline

Program at the Richmond School or other appropriate school as determined by the District containing all of the same components of the CD–Borderline program at the Richmond School.

7. Additional testimony is not necessary to supplement the record.

8. The Parents have not prevailed in this action.

9. The District is ordered to convene an IEP meeting for the 1995–96 school year within the next thirty (30) days consistent with the findings of the this [sic] order. In addition the School Staff at the Kradwell school should be given the opportunity to attend and provide input to the development of such IEP.

On July 27, 1995, before Plum issued his opinion, Heather's parents filed suit in federal district court, alleging Heather had been denied her statutory right to a free appropriate public education under the IDEA. Following cross-motions for summary judgment, the district court entered judgment for the defendants Pewaukee School District, State of Wisconsin, and various individuals employed by each. The court addressed both the substantive and procedural violations alleged by Heather's parents. On the substantive issues before the court, its conclusion matched that of review hearing officer Plum. The court found that a preponderance of the evidence supported the district's determination that Heather was other health impaired. More importantly, the court held that "the IEP and the placement at the Richmond School satisfies the IDEA's requirement that Heather be provided with a free appropriate public education." It rejected the conclusion that Heather should remain in the LD program, finding no evidence supporting Braaksma's conclusion that the Cognitively Disabled–Borderline program at the Richmond School was inappropriate given Heather's other health impaired disability. Noting no support in the record for such a determination, the district court also rejected Braaksma's conclusion that the district had mislabeled Heather as cognitively disabled.

The district court also concluded that Heather's civil rights had not been denied. "Neither the district defendants nor the state defendants discriminated against Heather because of her disabilities nor did any of the minor procedural violations result in the plaintiff being denied a free appropriate public education." The court concluded that in many instances the procedural violations about which Heather's parents complained had been waived during the "long and tortuous course of this proceedings." Dissatisfied with each level of decision to date, Kathy S. on behalf of Heather appeals the district court's entry of summary judgment for the defendants.

## II.

█ The standard of review under which this court considers Heather's challenge differs from that governing the typical review of summary judgment. The Individuals with Disabilities Education Act dictates that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(e)(2). When neither party has requested that the district court hear additional evidence, as was the situation in Heather's case, there is nothing new presented only to the district court; thus "[t]he motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Hunger v. Leininger*, 15 F.3d 664, 669 (7th Cir.1994), *cert. denied*, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994). Despite being termed summary judgment, the district court's decision is based on the preponderance of the evidence. 20 U.S.C. § 1415(e)(2); *Hunger*, 15 F.3d at 669. The party challenging the outcome of the state administrative decision bears the burden of proof. *Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.*, 938 F.2d 712, 716 (7th Cir.1991), *cert. denied*, 502 U.S. 1066, 112 S.Ct. 957, 117 L.Ed.2d 124 (1992).

█ In reviewing the administrative record, the district court is required to give "due weight" to the results of the administra-

tive proceedings and not "to substitute [its] own notions of sound educational policy for those of the school authorities," whose decision it is reviewing. *Id.* 938 F.2d at 715 (quoting *Board of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050–51, 73 L.Ed.2d 690 (1982)). We review the district court's judgment as a mixed question of law and fact. While we thus review the ultimate determination *de novo*, in the absence of any mistake of law, we may only reverse the district court if its findings were clearly erroneous. *Id.* 938 F.2d at 716 (citing *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 990–91 (1st Cir. 1990), *cert. denied*, 499 U.S. 912, 111 S.Ct. 1122, 113 L.Ed.2d 230 (1991)).

In this case there were two administrative decisions: one resulting from the initial hearing conducted by Braaksma, and one resulting from the second-level appeal conducted by Plum. While the two decisions were in accord on most issues, such as that Heather's primary handicap was other health impaired and that the district had not violated Heather's right to a free and appropriate public education, they disagreed on two: whether the school district had misidentified Heather as cognitively disabled, and whether the IEP placement at Richmond School was appropriate. In each instance, Heather's parents argue the district court should have given "due weight" to Braaksma's decision (ruling in their favor) and ignored Plum's determination that Braaksma had erred. The school district argues that in reviewing administrative decisions, the district court must give due weight to the final state determination which, in Wisconsin, is that of the administrative review officer, in this case Plum. The district court's position appears to be correct.

First we note that the "due weight" which the court must give to the hearings below is not to the testimony of witnesses or to the evidence—both of which the court must independently evaluate—but to the decisions of the hearing officers. *Board of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.*, 41 F.3d 1162, 1167 (7th Cir.1994). " 'Due weight' necessarily implies some sort of deference to the agency's decision, and

considering the officer's special expertise in education law, we think a sound basis exists for giving deference to the decisions of the hearing officers." *Id.* This is an easier task where, as in *Murphysboro*, the hearing officers are in accord. But where the review officer reverses the hearing officer, which of the two conflicting decisions are to receive the due deference *Rowley* mandates? *Murphysboro* did not answer this question. Its reference to "hearing officers" referred to both the initial hearing officer (the level I hearing officer) and the review officer (the level II hearing officer). We find no direct discussion of this question in any case arising from this circuit. But as the Sixth Circuit explained in an Ohio case:

> Where a state has set up a two-tiered review process, ... [w]e conclude that the only logical position, under *Rowley* and general principles of administrative law, is that federal courts are required to defer to the final decision of the state authorities, in this case that of the [Review Officer]....
> [I]t makes no difference that there may have been some disagreement among the state officers during the course of the state proceeding.

*Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir.1990). The Second Circuit has held likewise:

> *Rowley* requires that federal courts defer to the final decision of the state authorities, and that deference may not be eschewed merely because a decision is not unanimous or the reviewing authority disagrees with the hearing officer. There is no principle of administrative law which, in the event of a disagreement between a hearing officer and reviewing agency over demeanor evidence, obviates the need for deference to an agency's final decision where such deference is otherwise appropriate.

*Karl v. Board of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (2d Cir.1984). The Third Circuit has reached the same conclusion. "[W]e conclude that a district court should still give 'due weight' to the appeals panel's decision when it reverses the hearing officer's conclusions of law, inferences from proven facts, and factual findings based on

credibility judgments where non-testimonial, extrinsic evidence justified the appeals panel's contrary decision." *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 529 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1419, 134 L.Ed.2d 544 (1996). In *Carlisle*, "because the appeals panel found that the extrinsic evidence in the record supported conclusions contrary to those of the hearing officer, the district court correctly gave the [appeals] panel's decision 'due weight' notwithstanding the panel's differences with the hearing officer." *Id.* at 529–30.

■ One more consideration governs our review: what exactly is the issue before the court when reviewing state IDEA administrative decisions? *Rowley* warned that "courts lack the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." 458 U.S. at 208, 102 S.Ct. at 3051–52 (internal quotations omitted). Accordingly, "courts must be careful to avoid imposing their view of preferable educational methods upon the States." *Id.* at 207, 102 S.Ct. at 3051. The educational methods are left up to the states; they are obligated only to comply with the requirements of the IDEA which requires certain procedures set out in the Act, and that an IEP be developed for each disabled student "that is reasonably calculated to enable the child to receive educational benefits." *Murphysboro*, 41 F.3d at 1166. "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Id.* "The school district has met the substantive requirements of the [IDEA] if its proposed placement is reasonably calculated to be of educational benefit to the handicapped child." *Board of Educ. of Community Consol. Sch. Dist. 21,* 938 F.2d at 716.

### III.

Heather appeals the district court's entry of summary judgment on the ground that it erred in determining that she had not been denied substantive or procedural rights under IDEA. Briefly stated, Heather's parents allege she was denied a substantively appropriate education when the state administrative review ruled that the district had not misidentified Heather as cognitively disabled nor denied her a free appropriate public education, and affirmed the district's individual education plan offering Heather the Richmond School placement. Procedurally, Heather's parents allege her rights were violated when both the hearing officer and the review officer exceeded the respective 45- and 30-day state and federal time limits for issuing their decisions. They additionally allege that the district's failure to consider or provide a separate hearing for their equitable participation claim also violated Heather's statutory rights under IDEA. We examine her substantive claims first, because their resolution facilitates the resolution of her procedural claims.

### A. Substantive Claims

*1. Whether the school district erroneously identified Heather as cognitively disabled.*

■ Heather argues the school district identified her as cognitively disabled. She equates such an identification with being labeled "mentally retarded." Heather's parents were apparently concerned enough about such an identification so as to refuse explicitly to permit the district (and, apparently, others) to test Heather for cognitive disabilities. Hearing officer Braaksma ruled that "the District misidentified Heather's disability when the District identified her primary handicapping condition as Cognitively Disabled." This finding was reversed by review officer Plum who found no evidence in the record supporting Braaksma's conclusion. Instead,

[a] review of the entire record reveals that none of the IEPs developed by the District identify [Heather's] primary handicapping condition as Cognitively Disabled. An examination of the IEPs developed in May 1993, June 1993, and September 1993 do not reflect a conclusion that the District had labeled [Heather] Cognitively Disabled. A review of the IEP developed in June 1993 and in September 1993 as well as the testimony of M-team members re-

veals that their consensus concluded that the primary handicapping condition for this child is "Other Health Impaired."

Our review of the IEPs and M-team reports supports review officer Plum's conclusion that the district did not identify Heather as cognitively disabled.

Heather argues we should nevertheless defer to Braaksma's finding that the school district misidentified Heather. Heather argues that despite the fact that none of the M-team reports or IEPs developed by the district identified her as such, Roberts and some of Heather's teachers who were members of the M-team believed Heather was cognitively disabled. There were indeed discussions, identified in Heather's brief, in which several teachers who worked closely with Heather raised the issue. But that is all irrelevant to the question of whether the district identified her as such. The M-team reports and IEPs clearly identify Heather as other health impaired, notwithstanding any discussions to the contrary. These reports identifying Heather as other health impaired are signed by those very teachers she identifies as raising questions about whether or not she was cognitively disabled. The purpose of the multidisciplinary teams is to bring a number of expert perspectives to the consideration of a handicapped student's condition and educational needs. That purpose is best served by serious discussions that examine all reasonable viewpoints. While by refusing to permit her to be so tested Heather's parents may have wished to prevent any discussion of whether Heather was cognitively disabled, the M-team members would have been derelict not to consider the possibility given their collective experience with Heather. Nor does anything in the law require unanimity among those responsible for evaluating a disabled student. The question is not what was discussed, or what an individual member believed about her condition, but rather what the school district concluded. And that is determined by the content of the IEP.

Despite his conclusion that the district had misidentified Heather's condition, Braaksma's report reveals otherwise. Braaksma found that "[i]t was the M-team's conclusion at the meeting on June 2, 1993 that Heather met the criteria for OHI [other health impaired]. This conclusion is supported." Not only is it supported, it is not contested. The school district, through its M-team reports and IEPs determined Heather was other health impaired. Braaksma concluded the same. So did Plum. And while Heather's parents argue she should be instructed in an LD program, they do not contend that she is not other health impaired. The issues here are factual, not legal. Given this record, we can hardly conclude that the district court was clearly erroneous in itself concluding that a preponderance of the evidence revealed that the Pewaukee School District had identified Heather, not as cognitively disabled, but as other health impaired. So we affirm on this issue.

■ In any event, whether Heather was described as cognitively disabled, other health impaired, or learning disabled is all beside the point. The IDEA concerns itself not with labels, but with whether a student is receiving a free and appropriate education. A disabled child's individual education plan must be tailored to the unique needs of that particular child. *Rowley*, 458 U.S. at 181, 102 S.Ct. at 3037–38; *Murphysboro*, 41 F.3d at 1166. In Heather's case, the school is dealing with a child with several disabilities, the combination of which in Heather make her condition unique from that of other disabled students. The IDEA charges the school with developing an appropriate education, not with coming up with a proper label with which to describe Heather's multiple disabilities.

### 2. The Richmond CD placement offer.

■ Heather's parents also appeal the district court's entry of summary judgment on the issue of whether or not the district's placement offer in the CD [cognitively disabled] borderline program at Richmond School constituted a free appropriate public education. Hearing officer Braaksma had ordered the district to convene a new IEP meeting and to offer a placement in the LD program at the Pewaukee Middle School. This order appears inconsistent with Braaksma's conclusion that the district had not vio-

lated Heather's right to a free appropriate public education. Review officer Plum thought so and concluded that Braaksma had erred in ordering a change in Heather's placement. Plum reversed Braaksma and ordered that Heather be placed in the Richmond program pursuant to the district's IEP and placement offer. The district court agreed with Plum, holding that "[t]he conclusion of Hearing Officer Braaksma that Heather should remain in the [LD] program is not supported by the record." [5]

Review officer Plum's decision is founded on the testimony of a number of psychologists who reviewed Heather's condition and concurred in one form or another with the Richmond borderline CD placement offer. Plum cited the testimony of Dr. Terrence McGuire, an evaluator hired by Heather's parents, which "supports a school program which is not learning disabled." Plum also relied upon Dr. Connie Dahlke, an associate professor in Special Education at the University of Wisconsin, who had explained that the Richmond placement was "an ideal setting for Heather." Douglas Faile, the director of Special Education in the Hartland–Lakeside School District, in which the Richmond School lies, identified the borderline CD program as most appropriate for Heather because the nature of the classes would maximize the response to Heather's complex needs. Specifically, the classes were smaller, had more adult supervision, and had curricula set up for a small group along the lines of life skills, vocational training, communication, as well as academics. Additionally, Plum cited the testimony of Nancy Mitchell, director of special education at Arrowhead High School, who identified the advantages of the Richmond School in terms similar to those of Dahlke and Faile. Thus, according to Plum, the record supported Pewaukee's IEP and placement offer placing Heather in the borderline CD program at Richmond School.

■ Heather's parents claimed reliance on these professionals is misplaced because the criteria by which they evaluated the Pewaukee placement offer also could have applied to an LD placement. For example, the criteria employed by Dr. Dahlke in her assessment of the Richmond program could also be said of an LD program at a Pewaukee School District middle school: that the classes were small, that Heather would receive greater individual attention, that Richmond had an integrated program that would permit Heather to take general education classes where appropriate at which time she would be interacting with peers, that the placement would help Heather with self-advocacy skills in a small learning-appropriate setting and permit her to employ those skills in regular education classes with age-appropriate peers. Instead, Heather's parents wish us to focus on the testimony of a school psychologist from Milwaukee, Dr. Marianne Burton, who they claim testified that the CD placement was inappropriate for Heather. Our review of Burton's testimony indicates that it was more limited than Heather's parents suggest. Burton, who had only had out-of-school contact with Heather, thought it important that Heather have a peer group of age-appropriate children. She testified that Heather seemed to identify with same-age-level peers. But she also testified that Heather was very much aware of her own learning disabilities. And while her testimony would dispute a placement in which Heather spent her entire day with cognitively disabled children, that is not what Pewaukee proposed in its placement offer. Instead, the placement offer anticipates Heather's participation in same-age-level classes and activities except in academic classes where she requires the extraordinary attention available through the Richmond borderline CD program. Mainstreaming is not required in every case. *Murphysboro*, 41 F.3d at 1168. What the law requires is that a district maintain a "continuum of program options which range from regular classrooms with supplementary aids to separate schools and residential facilities." *Id.* While IDEA requires that chil-

---

5. The district court's opinion and order actually states: "The conclusion of Hearing Officer Braaksma that Heather should remain in the CD program is not supported by the record." From the context of the surrounding discussion, as well as the fact that Braaksma ordered that Heather remain in the LD program, the reference to the CD program appears to have been a typographical error.

dren with disabilities be mainstreamed to the extent possible, it does not require their integration at the expense of other IDEA mandates, such as minimum educational opportunities. *Id.* Because each child's social and academic educational needs are different we rely on the IEP procedures to determine the correct mix. Aside from Dr. Cahn, all of those involved in Heather's IEP and subsequent placement offer, as well as the psychologists cited above, concluded that Heather required a curriculum that provided the advantages of the Richmond School borderline CD program for academic subjects and same-age peer interaction outside of strictly academic subjects.

Heather's parents also focus on Dr. Cahn's alleged opposition to the Richmond placement. Cahn testified that he verbally disagreed with the placement during the committee meetings. But he never disagreed with it formally, and in fact signed the June 8, 1993 placement offer which was materially identical to the later September 29, 1993 offer. Cahn's testimony indicates that at best he struggled with the placement, while recognizing Heather's depressed cognitive potential. And Cahn only had limited contact with Heather, unlike other members of the placement group, such as Lynn Goeden–Hough, visual impairment specialist, and LD teachers Joanne Reinfeldt and Gayle Best, each of whom had extensive, daily classroom interaction with Heather. These three instructors, specialized in the areas of Heather's disabilities, were able to observe Heather both in the academic environment and in the peer-group environment. And they were all in accord that Heather had reached the limits of the LD program and would benefit the most from the Richmond borderline CD placement.

■ Heather's parents' argument that the district court and review officer Plum should not have relied upon the testimony of the various professionals who concurred with the Richmond placement offer because their analysis would also support an LD program is legally irrelevant. The issue is whether the Richmond placement was appropriate, not whether another placement would also be appropriate, or even better for that matter.

The school district is required by the statute and regulations to provide an appropriate education, not the best possible education, *Board of Educ. of Community Consol. Sch. Dist. 21 v. Illinois State Bd. of Educ.*, 938 F.2d at 715 (citing *Rowley*, 458 U.S. at 192, 102 S.Ct. at 3043–44), or the placement the parents prefer. *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988). This is not to say that the Richmond placement is not the best available. Indeed, there likely is more than one solution to the problem of best educating Heather. Each would have its strengths; each would have its weaknesses. A court is particularly incapable of making such judgments, which is why it must defer to trained educators and not substitute " '[its] own notions of sound educational policy for those of the school authorities which they review.' " *Bd. of Educ. of Community Consol. Sch. Dist. 21*, 938 F.2d at 715 (quoting *Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050–51).

We note that the deference is to trained educators, not necessarily psychologists. While the latter certainly have a role to play, and can contribute meaningful insight to the evaluation of a student, the school district is required to bring a variety of persons familiar with a child's needs to an IEP meeting, including, specifically, teachers. See 34 C.F.R. § 300.344. In Heather's case, a great number of teachers and other professionals closely involved with her education over a number of years were involved in assessing her needs. Except for Cahn they were all in agreement. And Cahn's knowledge was admittedly limited: he had administered psychological tests to Heather, observed her in a clinical setting, and once observed her in a classroom. As Plum noted, the IEP and placement offer devised by the educators most familiar with Heather were supported at the hearing by a number of psychologists and experts in special education.

Lynn Goeden–Hough, who holds a master's degree in special education, worked closely with Heather for four years and was a member of the M-team and IEP committee. She testified that Heather's learning difficulties intensified as she progressed in grade level and from concrete academic skills

to more abstract skills. According to Goeden–Hough, the greatest benefit of the Richmond placement was that it would enable Heather to work in groups with children at her same academic level, permitting her to be more independent and less dependent on staff. The placement would permit Heather to engage in cooperative learning instead of engaging only one-on-one with her LD teacher. This perception is consistent with much of the record evidence supporting the district's IEP and Richmond placement offer.

Our review of the evidence confirms that the great weight of evidence supports the Richmond placement offered by Pewaukee Schools. The district court did not clearly err in concluding (by a preponderance of the evidence) that the district's IEP and placement offer complied with the statutory mandate to provide a free appropriate public education.

## B. Procedural Claims

Heather's parents also argue the district court erred in entering summary judgment for the defendants on two alleged errors with the administrative procedures. First, they allege that both hearing officer Braaksma and review officer Plum exceeded the federal and state mandated time limits for reaching their respective decisions. Second, they claim Heather's rights were further violated when the district refused to initiate a separate due process hearing to consider their equitable participation claim.

### 1. Timelines on administrative proceedings.

A decision must be reached within 45 days of a request for a hearing, and within 30 days of a request for review. 34 C.F.R. § 300.512. "A hearing or reviewing officer may grant specific extensions of time beyond the[se] periods ... at the request of either party." *Id.* In furtherance of the obligations that accompany federal educational funds, Wisconsin adopted an administrative code with parallel provisions. Wis. Admin. Code §§ PI 11.10(4)(b) and PI 11.11(4)(b) (1995).[6]

Heather argues that neither Braaksma nor Plum complied with these provisions. The district court determined only that "[m]any of the procedural violations of which the plaintiff now complains were actually waived during the long and tortuous course of these proceedings." The district court was addressing more alleged procedural errors than are before this court on appeal. Our review of the record with respect to the alleged violation of regulatory timelines—the only procedural error related to the hearings that is on appeal—reveals that the district court was correct about waiver, at least until the time the examiner took the case under advisement.

Heather's parents initially requested a due process hearing on August 12, 1993. On September 3, they requested that the hearing be held in abeyance; they rescinded this request on October 1. The parties did not mutually agree upon hearing officer Braaksma until early November. Braaksma held a prehearing conference on November 23, 1993. At that conference, the district requested and was granted an extension of time due to the number of issues Heather's parents had raised and the volume of evidence in the case. The parties agreed on an anticipated two-day hearing in December. Instead, the hearing lasted eleven days, commencing on December 20, 1993 and continuing, intermittently, until February 23, 1994. The parties agreed to a post-hearing briefing schedule under which final briefs were due April 15, 1994. They later agreed to extend this date to May 13, 1994.

In the end, the case was not submitted to hearing officer Braaksma until nine months after Heather's parents initially requested a hearing. This delay was the result either of extensions requested by the parties or mutually agreed-upon briefing timelines. As discussed earlier, by the time the case was submitted, the testimonial and evidentiary record was immense. Faced with this overwhelming record, Braaksma advised the parties it would take some time for him to decide the case. In order to assure Heath-

---

6. These provisions were in effect in 1994 and 1995. Wis. Admin. Code § PI 11.11 has since been repealed; the code has been amended to provide for direct state or federal review of the initial hearing. Wis. Admin Code § PI 11.10(11).

er's education was not disrupted in the meantime, on August 18, 1994 Braaksma ordered the development of an IEP and placement for the coming school year. Braaksma issued his final, detailed decision in November.

The review process was similarly delayed. Heather's parents requested the review on December 30, 1994. Through what the district terms an isolated administrative oversight, a review officer was not even appointed until February 1, 1995. After appointment of review officer Plum, both parties requested and agreed to a waiver of the 30-day review timeline based on the extensive record and number of issues. The parties agreed to a schedule under which briefs were due by May 22, 1995; review officer Plum would determine whether he required additional evidence by May 31; and if he in fact required none, he would issue his final decision by June 30. After the parties filed their briefs, Plum held a status conference at which he advised that due to the length of the briefs, the volumes of transcripts, the number of exhibits, and the fact that he had staff changes in his office, he would require additional time to render a decision. Both parties consented. On August 22, 1995, Plum requested that both parties supplement the record with case authority. In response, Heather submitted nineteen cases on August 28. Two months later, five months after final briefing, Plum issued his written decision on October 31, 1995.

These records indicate that Heather did agree with or at the least not object to substantial delays in the administrative decisions. But we disagree that she thereby waived the regulatory timeline entirely; at most she waived the statutory time limits up until the matter was fully before the appropriate hearing officer. Even accounting for the agreed-upon delays, Braaksma took six months and Plum five months to render a decision; each exceeded substantially the regulatory timeline.

The delay appears to have been due to the sheer volume of this case, a volume that this court also has faced in our *de novo* review. Heather's parents and counsel share responsibility for this record. Along the way, they have challenged every perceived substantive

or procedural error, requiring ever more documentation and testimony both on Heather's behalf as well as on the district's. As hearing officer Braaksma noted, Heather has been exposed to test after test. Heather's parents sought additional outside testing. All these tests, as well as the testimony of those who evaluated them, ended up in the record. Having generated so many issues and so much evidence, it is entirely unreasonable to demand a detailed decision from the hearing officer within the time frame dictated by the regulations. Nevertheless, unreasonable or not, there is no doubt that the administrative reviews in Heather's case exceeded the regulatory timeline.

■ However, the delay in itself did not necessarily violate Heather's rights. The question is whether the delay deprived Heather of what the law requires, a free appropriate public education. "Procedural flaws do not automatically require a finding of a denial of a [free appropriate public education]. However procedural inadequacies that result in the loss of educational opportunity ... clearly result in the denial of a [free appropriate public education]." *W.G. v. Board of Trustees*, 960 F.2d 1479, 1484 (9th Cir.1992) (citing *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 982 (4th Cir.1990)). Heather's parents admit that not all procedural violations result in the denial of free appropriate public education. But they argue that in Heather's case the delays in fact did deprive Heather of educational opportunity. We do not agree. First, as discussed above in part III.A., we affirm the district court's determination that a preponderance of the evidence supports both the hearing and review officers' conclusions that the district had not denied Heather a free appropriate public education. Because each hearing along the way (as well as the district court and this court) has determined that the district did not deprive Heather of her statutory right to educational opportunities, any delay in the decision had no effect other than to maintain Heather in an extremely modified LD program at a Pewaukee school district middle school pursuant to IDEA's stay-put provision. This is not only where Heather had been placed before, with the approval of

her parents, it is also the result they sought to achieve in their challenge of the IEP and placement offer to the Richmond School. Furthermore, in August 1993 hearing officer Braaksma issued an order directing the district to devise an interim IEP and placement offer for Heather for the upcoming school year so that her stay-put status would not infringe on her educational opportunities. This too was what Heather's parents ultimately sought, essentially an updated version of Heather's LD placement at Pewaukee. So again, the delay appears to have served Heather's parents' desire to keep her out of the Richmond School.

In any event, to the extent there was a delay in decision that was not the result of requested extensions or agreed-upon briefing schedules, that delay did not begin until after the final briefs were submitted to Braaksma on May 13, 1994. But Heather's parents withdrew her from the district on May 10— three days earlier. Instead of waiting any period of time, even that mandated by the regulations, Heather instead was enrolled in a program at the private Kradwell School. It can hardly be said in these circumstances that Heather was denied educational opportunities. Given the outcome of the state administrative process, as well as the district court's and this court's affirmance of that outcome, it is readily apparent that Heather's parents would have continued to keep Heather outside the Pewaukee public school system had the decisions been reached in a more timely fashion. The evidence supports a conclusion that Heather would have been withdrawn in either event. Given that reality, we cannot conclude that Heather was denied a free appropriate public education by the delays in the hearing officer's resolution of her case. See *Amann v. Stow Sch. Sys.*, 982 F.2d 644, 653 (1st Cir.1992) (untimely decision caused no remediable harm where

no evidence that late decision had effect on parents' decision to enroll child in private school).

### 2. Equitable participation claim.

■ The second procedural claim is that the district denied Heather her statutory rights when it refused to provide her with transportation or equitable participation[7] and thereafter rejected her demand for a new due process hearing to consider the issue. Heather's parents made their request in August, three months after withdrawing Heather from the Pewaukee school district, and before hearing officer Braaksma issued his opinion. The school refused. Its position was that a request for interim services pending the outcome of the due process hearing then under consideration was inappropriate given hearing officer Braaksma's August 16 interim order identifying Heather's placement as the LD program in Pewaukee School District's Asa Clark Middle School. The school district maintained that because Heather's parents had voluntarily elected not to comply with Braaksma's order governing Heather's 1994–95 placement, the district had no continuing obligation beyond that order, with which it stood ready to comply. In response Heather's parents requested a new due process hearing in regard to the district's failure to provide transportation or equitable participation for Heather.

The district refused to appoint a new hearing officer or initiate a new due process hearing because, it maintained, the issues involved were the same as those pending before Braaksma. The district argued Heather should raise any additional claims related to her placement with Braaksma, who continued to exercise jurisdiction over the case. Subsequently, Heather's parents made

---

7. At the time Heather's request for transportation and equitable participation was denied, the Code of Federal Regulations specified that school districts must provide students enrolled in private schools "a genuine opportunity for equitable participation in accordance with the requirements ... in the authorizing statute and implementing regulations for a program." 34 C.F.R. § 76.651. The level of "equitable participation" provided to children voluntarily placed in private schools was at the discretion of the school dis-

trict, and could be less than that provided to children in public schools or involuntarily placed in private schools. *See K.R. v. Anderson Community Sch. Corp.*, 81 F.3d 673, 676–80 (7th Cir. 1996) (explaining equitable participation and discretion afforded school districts under the then-existing IDEA), vacated, —— U.S. ——, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997) (remanding case for further consideration in light of the Individuals with Disabilities Education Act Amendments of 1997).

no attempt to bring the issue before Braaksma. Nor was the issue taken up with review officer Plum.

Heather argues that the school district defendants abused their discretion by refusing to provide her with transportation and equitable participation, and the state defendants violated IDEA when they concurred with the district and refused to conduct a second due process hearing. The district court did not discuss this issue directly, holding simply that Heather's claims of procedural violations were minor and in any event had not denied her a free appropriate public education.

At the time Heather's parents submitted their request for equitable participation to the district, the administrative process for obtaining such services for a private school student was set out in the Department of Public Instruction's bulletin issued in September 1992:

> The first two steps in the process are the same two that were completed under FAPE [free appropriate public education], i.e., screening and an M-team evaluation. Those two steps remain the same and do not need to be repeated. The first step unique to a private school student is reached after the parent has rejected the IEP and placement offer of FAPE from the public school system. After that rejection occurs, a district is required to create a second IEP which is designed to provide a private school student with a genuine opportunity for equitable participation in the district's special education program.

Department of Public Instruction Information Update Bulletin No. 94.7 (quoting Bulletin No. 92.7 at page 3). Because Heather's parents had never rejected the district's IEP and placement offer, but instead had, along with the M-team evaluation underlying them, challenged them as legally insufficient, they had never observed the procedural requirement for obtaining equitable participation benefits. This rests on a distinction between an IEP and placement offer that is appropriate but which the parents choose to reject, and an IEP and placement offer that is not appropriate which the parents challenge under due process provisions. In the latter,

the parents are not rejecting an offer of a free appropriate public education, they are arguing that they have not yet received such an offer. While the distinction seems slight, at least one circuit court has recognized similarly nuanced distinctions as controlling. In *Evans v. District No. 17*, 841 F.2d 824, 829 (8th Cir.1988), the Eighth Circuit held that the failure of a child's parents to request a change in placement and thereby place the district on notice prevented the parents from recovering the costs of their unilateral decision to place their child in private school. Expressions of concern and dissatisfaction with the district's placement were not enough.

Heather argues *Evans* is inapposite because the school district in Heather's case could have figured out that her parents were rejecting the IEP and placement offer when they filed for a due process hearing on its legal adequacy. They claim that a request for a due process hearing acted as notice of rejection. But the IDEA, the C.F.R., and state regulations passed in compliance with them, hold the school district and the parents to strict procedural requirements. This is not a case of an unversed parent bamboozled by a sophisticated school district. Heather's parents were familiar with the requirements: Heather's mother is herself an LD teacher in another district and she was represented by experienced counsel from the very earliest stages of Heather's M-team evaluations. Having been familiar with the rules and procedures, in fact having employed them against the school and district on numerous occasions, Heather's parents should be expected to comply with them as well.

In any event, Heather's parents disagreed with the school district's procedural basis for rejecting their application for equitable transportation. So they requested a due process hearing which was also rejected, as discussed above, because the matter was then before hearing officer Braaksma. Heather's parents argue she was entitled to a due process hearing because the issues involved in equitable participation were different than those before Braaksma: whether the district had provided Heather a free appropriate public education. Heather's par-

ents are incorrect. Their challenge to the IEP and placement offer extended to Heather by the district is rooted in their challenge to the M-team evaluation. See *supra* at 1054–55 (discussing whether M-team had labeled Heather as cognitively disabled). The procedure for obtaining equitable participation requires rejection of an IEP and placement offer at which time the school is required to devise a new IEP and placement offer. But the new IEP is built upon the M-team evaluation's conclusions about a student's disabilities and physical, psychological, and educational needs. The M-team evaluation is not repeated. See Wisconsin Department of Public Instruction Update Bulletin 94.7, quoted *supra* at 1060–61. And in Heather's case the validity of the M-team evaluation was pending before Braaksma.

Where an issue under consideration by an earlier due process hearing is essential to the determination of a subsequently requested due process hearing, the parents should move to reopen the earlier hearing. Cf. *School Committee of Town of Burlington, Mass. v. Department of Educ.*, 471 U.S. 359, 373–74, 105 S.Ct. 1996, 2004–05, 85 L.Ed.2d 385 (1985) (parents who unilaterally move child during pendency of due process hearing run risk that if IEP is ultimately deemed appropriate they will bear financial costs of private placement). Nor is it unreasonable for the state to demand that the matter be brought before the same hearing officer already considering at least part of the issue. To do otherwise risks incompatible decisions from the hearing officers and all the accompanying problems associated with res judicata, collateral estoppel, etc. Heather's argument might be different had she tried to bring these claims before Braaksma and been rebuffed. But because she never tried, she is estopped from arguing that the administrative procedures set up by the state for considering her application for equitable participation are legally insufficient. Cf. *Burke County Bd. of Educ. v. Denton*, 895 F.2d at 982 (parents "have no strong equitable argument" when they have acted unilaterally rather than complying with administrative procedures).

## IV.

Our *de novo* review of the record finds no clear error on the part of the district court in its determination, based on a preponderance of the evidence, that neither substantive nor procedural errors denied Heather a free appropriate public education. Accordingly, we affirm the district court's entry of summary judgment for the defendants.