Kenneth BRETT, Plaintiff,

v.

GOSHEN COMMUNITY SCHOOL CORPORATION, Elkhart County Special Education Cooperative, Mary Beth Hulecki, Ph.D., and Cheryl Winkelman, Defendants.

No. 3:97CV426–CAN.

United States District Court,
N.D. Indiana,
South Bend Division.

Sept. 6, 2001.

Margot F Reagan, Konopa Reagan & Kenyon PC, South Bend, IN, Charles P Rice, Boveri Murphy Rice Ryan & LaDue, South Bend, IN, for Kenneth Brett, plaintiff.

Timothy J Maher, Edward N Kalamaros & Associates, South Bend, IN, Philip E Kalamaros, Hunt Suedhoff Kalamaros LLP, South Bend, IN, for Goshen Community School Corporation, Elkhart County

Special Education Cooperative, Mary Beth Hulecki, PH.D., Cheryl Winkelman, defendants.

## MEMORANDUM AND ORDER

NUECHTERLEIN, United States Magistrate Judge.

Kenneth Brett (Brett) sued the Goshen Community School Corporation, the special education cooperative, its director, and one of his teachers, alleging that Defendants discriminated against him while he was a student at Goshen High School.

Brett is twenty-four years old, has an IQ of 133, and scored a 1430 on the Scholastic Aptitude Test (SAT). He earned his high school diploma in June 1996. Brett alleges that Defendants denied him a free appropriate public education, wrongfully conferred a high school diploma on him, and denied him the services and privileges to which other similarly situated students are entitled. Brett alleges that Defendants violated the Americans with Disabilities Act, the Rehabilitation Act, and the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

The Defendants, Goshen Community School Corp., Elkhart County Special Education Cooperative (ECSEC), Mary Beth Hulecki (Hulecki)[1] and Cheryl Winkelman (Winkelman)[2] moved for summary judgment on grounds of mootness and on the issue of free appropriate public education.

Although the Court concludes that this case is not moot, it nevertheless finds no evidence that Brett received anything less than a free appropriate public education. Defendants followed the advice of trained psychologists and educators when they prepared Brett's Individual Education Plans (IEP's). Brett received extensive special educational benefits and related services for elementary school, middle school, and five years of high school, and he successfully completed all necessary graduation requirements. The only time that the Defendants did not fulfill the wishes of either Brett or Valoria Brett, his mother, was the very last IEP when she objected to the plan to graduate, despite Brett's (who was then 18) and the committee's agreement with the plan.

## I. SUMMARY OF MATERIAL UNDISPUTED FACTS

The Court bases its factual summary primarily on Defendants' Statement of Material Facts, which Brett admits "... is generally not in dispute ..." Plaintiff's Amended Response to Defendant's Motion for Summary Judgment (Plaintiff's Response) at 1. The Court has also used the additional facts set forth by Brett in his response. Id.

Defendants moved to strike several of Brett's "Additional Pertinent Facts." Defendants' Objection, Motion to Strike and Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment [Doc. No. 52] at 5–6. The Court finds that the motion to strike is factually inaccurate and relates immaterial facts, and thus denies it.

Although highly intelligent, Brett had difficulty at school, including skipping school and not doing his homework. Defendants identified Brett at an early age to be disabled, and many different psychologists, psychiatrists, and other counselors have aided him through his school career. His disability was variously described as severe depression, emotional handicap,

---

1. Mary Beth Hulecki was the Director of Defendant Elkhart County Special Education Cooperative during Brett's high school years.

2. Cheryl Winkelman served as Brett's special education teacher for several years.

learning disability, or attention deficit/hyperactivity disorder, yet all concurred that his medical condition was "complex." Brett frequently changed schools, counselors and physicians, and his emotional state fluctuated. Brett's educational plan frequently changed to reflect his needs.

## A. Elementary School and Middle School

Brett was born on June 19, 1977, and his parents divorced when he was in kindergarten. At his mother's request, a psychologist evaluated him at age 7. He was diagnosed with an anxiety disorder with depressive features and therapy was recommended. The psychologist discounted the possibility of attention deficit disorder and concluded that a diagnosis of learning disabilities was premature.

Brett's mother sought help for her son from the Goshen Community Schools (Goshen Schools) in 1985. Goshen Schools completed an Individual Conference Report and assessed Brett's school situation. The tests revealed that he had average or above average mental ability, that he performed appropriately for his grade level when he was on task, but that his work and study habits were weak. Emotionally handicapped (EH) programming was recommended. Goshen Schools tested him again in 1987, and found him at or above average in intelligence, although his emotional problems and problems with written tasks continued. The Goshen School psychologist, Hulecki,[3] recommended that

Brett receive emotionally handicapped instruction.

Brett's mother took him to Maple Hill Psychological and Developmental Services for a psycho-educational evaluation in 1988. Although he scored high average or average on intelligence testing, problems with "distractability, fidgetiness, and anxiety including poor peer relationships and conflictual relationships at home" were noted. He was diagnosed with attention deficit disorder (ADD)[4], but not an anxiety disorder. They recommended Ritalin for the ADD, psychotherapy for poor self-esteem and family conflicts, and "special attention from his sixth grade teachers."

Defendant Elkhart County Special Education Cooperative (ECSEC) reevaluated Brett in 1990, the year before he started high school. He achieved superior intelligence scores,[5] and his academic skills were above average. The case conference recommended learning disability (LD) consultation services for the remainder of the school year, and LD strategies/study hall and self management for 1991–92. Brett's mother also had him reevaluated in 1990 for ADD, and Ritalin was recommended.

Throughout elementary and middle school, school officials conducted individual conferences with Brett and his mother, in which officials explained the evaluation of his condition and made recommendations for his education in the upcoming school year. Brett's mother attended each conference and signed a form stating she agreed with the recommendations.

---

3. Hulecki was a school psychologist for one year before taking the position as Assistant Director, and later Director, of the newly-formed Elkhart County Special Education Cooperative. Hulecki Deposition at 5–7, 11, 18.

4. The current official name for ADD is "Attention–Deficit/Hyperactivity Disorder," or ADHD. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 85–93 (4th ed., text revision, 2000) (DSM–IV–TR). The Court, though, will use the term that Mr. Brett's psychologists used.

5. He scored a 125 Full Scale IQ on the Weschler Intelligence Scale for Children—Revised ("WISC–R") intelligence test.

## B. High School

### 1. 1991–92 Freshman Year

Brett attended Goshen High School as a freshman during the 1991–92 school year. ECSEC completed an IEP on November 27, 1991, noting his 1990 intelligence test and concluding that he had superior ability, although his written language and spelling were significantly below expectancy level. His class performance fluctuated as he failed to complete and turn in assignments, and he had difficulty expressing his feelings. The IEP recommended 71% mainstreamed education and 29% special education, including Learning Disability (LD) support/study hall and EH/LD self management. Brett and his mother signed the November 1991 IEP. He earned several credits toward graduation that year.

### 2. 1992–93 Sophomore year

Brett did not return to Goshen High School for his sophomore year; instead, his mother placed him at Bethany Christian School (Bethany). Bethany did not have a special education program, but he did attend a special study hall with individual assistance from a teacher. Kenneth Brett Deposition at 29. His grades improved at Bethany, and he earned several more credits toward graduation. *id.* at 30 Defendants had no contact with Brett or his mother during his that year, and they did not prepare an IEP for him.

### 3. 1993–94 Junior year

Brett began his junior year at Bethany. Due to severe allergies and depression, Brett started to miss classes and not complete work, and he was failing five of his six academic classes. In November 1993, his mother requested special education services from ECSEC, and they completed an evaluation and convened a case conference. Brett and his mother wanted him to

continue attending Bethany, so the committee suggested modifications and adjustments to his curriculum there. If the modifications were not possible, he could return to Goshen High School. He received academic credit for three of his classes that semester.

Brett's mother removed him from Bethany and returned him to Goshen High School for the second semester. Defendants held a case conference on February 21, 1994. Brett's IEP recommended 18% special education services, and he was not identified as emotionally handicapped. His mother approved the February 1994 IEP. His attendance problems and his failure to complete assignments continued, and his depression intensified during this semester. Complaint ¶ 8. Another case conference was held on March 23, 1994.

The March 1994 conference modified Brett's schedule at his mother's request. Because of his recurring attendance problems he was assigned to afternoon classes only, and he received 3% special education each day. He completed the afternoon classes for additional academic credits toward graduation.

While the March 1994 IEP did not mention emotional handicap, Defendants referred Brett to a neuropsychiatrist and he began seeing Roger Hensley, M.D. Brett and his mother also saw a child psychologist, Marc A. Zackheim, Ph.D. during the summer of 1994.

### 4. 1994–95 Senior year

On September 16, 1994, Defendants held a conference to assess Brett's educational needs for the 1994–95 school year. This was his fourth case conference in less than a year. His mother, her attorney, Judy Menadue, and Brett attended the conference, in which Brett's continuing attendance problems were discussed. The Sep-

tember 1994 IEP stated that his emotional handicap was primary and his learning disability was secondary. He was also assessed as profoundly depressed, incapable of meeting age related demands, and unable to function within a traditional school environment.

Dr. Zackheim attended the conference and recommended residential placement. The conference committee, including his mother and her attorney, agreed with his recommendation and the conclusion that Brett's extensive emotional, educational and vocational needs exceeded what Goshen High School could provide. In residential placement, Brett would not live at home with his mother, but it would provide him with full-time special education and an extended school year to maintain an attendance routine. (Hulecki Deposition at 74). Hulecki suggested that Brett's mother establish a guardianship for him before his eighteenth birthday so that he could make his own educational decisions. See Evans v. Tuttle, 613 N.E.2d 854, 860 (Ind. Ct.App.1993) ("a child over the age of 18 has the option whether or not to continue with an education"). She decided against a guardianship.

The residential placement required the prior approval of the Indiana Department of Education. Brett was provided home instruction while the approval was pending and he achieved additional academic credits toward graduation during his home instruction. His mother researched and rejected possible residential placements in Indiana. She identified two out of state schools that she preferred for Brett. The Indiana Department of Education approved her selection and agreed to pay $72,032.00 for Brett to attend C.E.D.U. in California from May 1995 to June 1996. Brett performed well at C.E.D.U., earned two semesters of additional credits toward graduation, and scored 1430 on the SAT.

After only six months, Brett demanded to leave the school, his mother agreed, and he returned home. Hulecki wished that Brett could have stayed to complete his term at C.E.D.U.

Indiana then paid for him to attend another out of state residential academy chosen by his mother, the John Dewey Academy (Dewey) in Massachusetts. Brett stated during his deposition that he had no complaints about Dewey. (Kenneth Brett Deposition at 46, 57.) He demanded to leave C.E.D.U. so that he could attend Dewey. Id. at 46. Shortly after arriving at Dewey, he decided that he "did not want to be in Massachusetts. And I did what I could to come back, and I was able to come back to Goshen." Id. at 71. Brett, now 18 years old, told Winkelman and Hulecki that he wanted to return to Goshen High School. Both Winkelman and Hulecki recognized that Brett was exercising his independence and appeared to have a direction in mind when he initiated his calls requesting to return to Goshen. Hulecki told him that she thought he should stay at Dewey because she feared another move would not be good for him. She wanted him to finish school and graduate. Brett's mother acquiesced to her son's demands and returned him to Indiana.

Residential schooling had now failed Brett twice because he demanded and "did everything [he] could to come back," and his mother approved. Defendants had nothing to do with Brett's refusal to attend and learn from the schools in California and Massachusetts. His mother allowed him to quit the schools that provided a quality education and proper supporting services. Brett had rejected, with his mother's support, two very expensive and exceptional educational opportunities.

### 5. 1996

When Brett returned to Goshen High School, Defendants proposed an educational plan, even though he had not succeeded in or had deliberately "[done] everything [he] could" to quit all previous attempts to educate him. An IEP was written and a case conference was held on February 22, 1996. Brett advised the committee that he wanted to graduate since he only needed a few more credits. The committee recommended that for the remaining four months of the 1995–1996 school year, Brett would attend four classes and graduate in June 1996. The plan recognized Brett's emotional handicap and his learning disability. The IEP provided that he would attend one counseling session per week, and he agreed not to have more than six absences or three tardies. The members of the committee also decided that if he failed to attend class or complete his class work, they would then call another case conference to determine appropriate modifications.

Brett admitted that in February 1996 he wanted to get high school done as soon as possible. Although his mother attended the February 1996 conference, Brett, who was 18 years old and legally responsible for his decision, signed the placement recommendation form. His mother did not sign or object to it. Just a few days after Brett returned to Goshen High School, his father, with whom he was living, suffered a massive heart attack. Brett called 911 and attempted CPR, but his father died. Brett became severely depressed, and he moved in with his mother and stopped going to school.

His father's death disrupted Brett's emotional state, so a change in his IEP was required. On March 11, 1996, Hulecki sent a letter to Brett, with a copy to his mother and others, advising him that because he was not regularly attending class, he had choices to make regarding school. She advised him that he could begin attending classes and make up the missed work, drop out of school and receive a GED, not withdraw from school and receive F's in his classes, or meet with her immediately to pursue other means of getting his diploma. Hulecki advised Brett to immediately attend class. Brett agreed to meet, and Defendants convened another case conference on March 18, 1996, which Brett and his mother attended. The issues included his failure to attend school and complete assignments, his belief that he did not need residential schooling, and his request for a different educational plan. The case conference committee recommended homebound instruction for three classes, and weekly individual and family counseling. Brett agreed with the recommendations and signed the document. His mother disagreed with the recommendations and stated her belief that Brett was physically able to attend regular classes. She was concerned that anything less would not help him learn to function outside of a special education setting.

Brett and his mother began seeing Robert W. Savage, Ph.D. for family counseling in March 1996, for which ECSEC paid. At the 13th session, on April 12, 1996, Brett "became irate, cussed this counselor out and refused to continue counseling stating he was going to insist upon a new counselor from the Cooperative and he stormed out." 5/10/96 Letter from Savage, to Hulecki at 2. On May 10, 1996, Savage sent a letter to Hulecki reporting that Brett showed no interest in the counseling and was attending the sessions only to satisfy his mother and to meet school graduation requirements.

Hulecki also asked Zackheim to reevaluate Brett on April 8, 1996. Brett told Zackheim that he wanted to finish high school, go to college, and get on with his

life. He told Zackheim that he feared that his mother would evict him if he did not draw the process out and take college-like courses in high school. Zackheim concluded that Brett was much better and was able to recognize his own limitations as well as his plans for the future. Hulecki concluded from Zackheim's report that the school was on the right track with Brett's education.

Winkelman provided Brett's homebound instruction in the three subjects, and Brett's attendance was much improved. When Brett missed class, he advised Winkelman in advance and made arrangements to make up the time. He was also more punctual and worked longer hours.

## C. Graduation and post high school plans

The Defendants made preparations for Brett's future before he graduated. Special education students are typically sent to vocational rehabilitation, an outside program available to disabled individuals. Vocation rehabilitation services included tuition assistance, counseling, and job coaching. Hulecki arranged a vocational rehabilitation evaluation and advised Brett of a required orientation meeting on April 17, 1996, after which a counselor would call him to set up an individual appointment. Brett did not sign an enclosed Transformation of Information form to permit vocational rehabilitation to obtain his records. Ms. Hulecki sent a second letter to Brett to advise that a vocational rehabilitation counselor had scheduled a session for him on April 30, 1996. She reminded him to attend the required orientation meeting and to complete the release form. Winkelman assisted him with job and college applications.

Hulecki scheduled a meeting for May 1996 to discuss his future plans with his mother, a job coach coordinator, and a vocational rehabilitationist.[6] She also initiated several meetings to assist him in being reinstated in vocational rehabilitation, as he was still qualified for vocational rehabilitation services in November 2000. Brett completed graduation requirements and received a diploma from Goshen High School on June 1, 1996.

## D. Due Process Hearing/Mediation Request

About May 7, 1996, Brett's mother called Hulecki's office to request a due process hearing. On May 8, 1996, Hulecki replied that she was not aware of papers used to request a due process hearing, but she knew that papers were used to request mediation. Hulecki enclosed a copy of the state regulation that outlined the process to initiate a due process hearing.

About May 8, 1996, Brett's mother requested mediation papers. On May 9, Hulecki sent a blank mediation request form to her and advised her that Hulecki did not know what issues Brett's mother wanted to mediate. Hulecki suggested that since both sides must agree to the issues to be mediated, she and Brett's mother could complete the form together. Brett's mother did not respond.

On May 31, 1996, Hulecki wrote Brett's mother to advise her that she could not sign a Request for Mediation without including the issues to be mediated. Since Brett's mother did not want to meet with her to discuss the issues, Hulecki assumed that she preferred a due process hearing. Hulecki asked Brett's mother to advise her how she wished to proceed. Because Brett's mother did not call to arrange a meeting, Hulecki concluded that she did

**6.** Neither party has provided additional information about this meeting.

not want a mediation. On May 24, 1996, the Indiana Department of Education, Special Education Division, received Brett and his mother's request for a due process hearing regarding the appropriateness of Brett's program.

About June 7, 1996, Defendants moved to dismiss the request for hearing because Brett had graduated on June 1, 1996. The independent hearing officer concluded that there was no current case in controversy because Brett had graduated, so he dismissed the request.

### E. Brett's 1998 Evaluation

Margaret Snyder, Psy.D., performed a psychoeducational evaluation of Brett in 1998. Although the evaluation was filed late, the Court accepts the evaluation as a part of the factual record. Because Defendants first received a copy of the evaluation in 1998 and had an adequate opportunity to respond to the evaluation, the Court finds that they will suffer no prejudice from its late filing. The Court concludes that the evaluation contains very little that relates to the material issues in this case. The 1998 evaluation does not include an opinion about Brett's past educational program. The report does not identify any specific mistakes, gaps, or other failings with Brett's high school educational plans attributable to Defendants, nor does the report offer alternative opportunities that Defendants should have extended to Brett during his high school education. Treatment considerations in the report are expressed speculatively,[7] and there is no opinion in the report that his graduation was harmful, improper, or inappropriate in any way.

---

7. For example, although the evaluation notes that Ken *stopped* taking Ritalin in elementary school because the medication upset his stomach and did not work, it suggests that "Medi-

## II. SUMMARY JUDGMENT STANDARD

The Court must grant summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994).

The initial burden requires the moving party to demonstrate, with or without supporting affidavits, the absence of genuine issues of material fact and that judgment as a matter of law should be granted in the moving party's favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A question of material fact is a question which will be outcome determinative of an issue in the case, and the facts material in a specific case are determined by the substantive law controlling the given issue or claim. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir.1996).

Once the moving party has met the initial burden, the opposing party must go beyond the pleadings and designate specific facts which prove that there is a genuine issue of material fact for trial. *Id.;* Fed. R.Civ.P. 56(e). The court must view those facts in a light most favorable to the non-

---

cation *trials ... might* relieve some of the persistent symptoms of ADHD including anxiety as a secondary symptom." (Emphasis added.)

moving party. *Heinemeier v. Chemetco, Inc.,* 246 F.3d 1078, 1082 (7th Cir.2001). "Summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Doe,* 42 F.3d at 443 (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548). "The judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.* However, the evidence must raise more than some metaphysical doubt. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. BRETT'S CLAIMS ARE GOVERNED BY THE FREE APPROPRIATE PUBLIC EDUCATION STANDARD

■ Actions such as Brett's are usually pleaded pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.*[8] His complaint, though, does not allege a claim directly under the IDEA. Instead, it states three claims: the first under § 504 of the Rehabilitation Act, 29 U.S.C. § 794, the second pursuant to 42 U.S.C. § 1983 (alleging discrimination based on a violation of the IDEA), and the third under Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12131 *et seq.* The complaint also mentions the Equal Protection Clause of the Fourteenth Amendment to the Constitution.

Claims under the Rehabilitation Act, § 1983, and the ADA all permit successful plaintiffs to collect compensatory damages. The IDEA does not. *Charlie F. v. Board Educ. of Skokie Sch. Dist. 68,* 98 F.3d 989, 991 (7th Cir.1996). But the IDEA permits plaintiffs to seek remedies outside the IDEA, such as damages, if those remedies are available under another federal statute. 20 U.S.C. § 1415(f) (providing that "[n]othing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, title V of the Rehabilitation Act of 1973, or other Federal statutes protecting the rights of children and youth with disabilities"); *Charlie F.,* 98 F.3d at 991.

Although the remedies available under the claims alleged by Brett and the IDEA differ, the same legal standards are used to assess liability. Thus, the IDEA's educational and procedural requirements supply the legal standards to evaluate Defendants' liability in this case.

Under the IDEA, a student who is eligible for special education because of a disability is to be provided a "free appropriate public education" consisting of special education and related services. 20 U.S.C. § 1401(a)(18). Section 504 of the Rehabilitation Act requires the same. 34 C.F.R. § 104.33 (stating that the Rehabilitation Act requires states to provide a "free appropriate public education"). *Accord: J.D. ex rel. J.D. v. Pawlet Sch. Dist.,* 224 F.3d 60, 70 (2d Cir.2000) (stating that the Rehabilitation Act and the IDEA complement each other); *Gill v. Columbia 93 Sch. Dist.,* 217 F.3d 1027, 1034 (8th Cir.2000) (holding that the Rehabilitation Act and

---

8. Congress amended the IDEA in 1997. Such amendments do not apply retroactively to conduct that occurred before the amendments. *Doe v. Oak Park & River Forest High*

*School,* 115 F.3d 1273, 1283 (7th Cir.1997). Since all of the alleged violations in this case occurred before the amendments took effect, the pre-amended version of the IDEA is cited.

the IDEA apply the same standard); *Burilovich v. Board Educ. of Lincoln,* 208 F.3d 560, 564, 572 (6th Cir.2000) (summarily affirming district court's dismissal of Rehabilitation Act claim based on its analysis of the IDEA claim); *Michael C. v. Radnor Twnsp. Sch. Dist.,* 202 F.3d 642, 654 n. 13 (3d Cir.2000) (approving district court's summary treatment of Rehabilitation Act claim based on analysis of IDEA claim because Rehabilitation Act claim was "clearly derivative" of the IDEA claim); *Ridgewood Bd. Educ. v. N.E. for M.E.,* 172 F.3d 238, 253 (3d Cir.1999) (noting that there are few differences, if any, between the free appropriate public education standards of the IDEA and the Rehabilitation Act).

The ADA applies the same standard as the Rehabilitation Act. *Washington v. Indiana High Sch. Athletic Ass'n,* 181 F.3d 840, 845 n. 6 (7th Cir.1999) (holding that "the standards applicable to one act are applicable to the other. Title II of the ADA was modeled after § 504 of the Rehabilitation Act; the elements of claims under the two provisions are nearly identical, and precedent under one statute typically applies to the other"). In circumstances similar to the present case, courts have not distinguished between the analysis under the Rehabilitation Act and that under the ADA. Rather, courts have simply analyzed the IDEA standard and then applied that analysis summarily to the claims under the ADA and Rehabilitation Act. *See Burilovich,* 208 F.3d at 564, 572 (summarily affirming district court's dismissal of Rehabilitation Act and ADA claims based on its analysis of the IDEA claim).

Brett's Count II is derivative of the IDEA standards because it seeks to enforce the provisions of the IDEA through § 1983. The complaint also mentions equal protection, but it does not designate it as a specific count. To the extent that Brett alleges a violation of equal protection, that claim, though actionable separately from the IDEA, is governed by the same free appropriate public education standard. *Board of Educ. v. Rowley,* 458 U.S. 176, 200, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982) (holding that "neither the [IDEA] nor its history persuasively demonstrates that Congress thought that equal protection required anything more than equal access [to a free appropriate public education]").[9]

## IV. BRETT'S CLAIMS ARE NOT MOOT

■ Defendants argue that this case is moot because Brett is now 24 years old and because he has graduated from high school. Brett responds by claiming that he is entitled to "compensatory education," a judicially constructed form of relief designed to remedy the past educational failings for students who are no longer enrolled in public school due to their age or graduation. *Pihl v. Massachusetts Dept. of Educ.,* 9 F.3d 184 (1st Cir.1993)

### A. Indiana's Eligibility Regulations

A state that receives monetary assistance under the IDEA must establish policies and procedures that provide a free appropriate public education to all disabled students of the state "between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school." 20 U.S.C. § 1412(a)(1)(A). The IDEA permits states to opt out of providing a free and appropriate public education to students ages 3–5

---

**9.** Both Brett and Defendants reference a due process claim, but the complaint contains no such claim. To the extent a due process claim exists, it will be governed by the free appropriate public education standard of the IDEA as well.

or 18–21 if the state does not provide public education to nondisabled students in those age groups. Indiana's policy, as found in the state regulation states:

Public school corporations shall provide special education for all students five (5) years of age but less than twenty-two (22) years of age identified as disabled under this article, unless the student has completed high school graduation requirements.

511 IAC 7–4–1(b)

Under this standard, a student who is 22 years old or older, or who has graduated, is not entitled to a free appropriate public education.

## B. Mr. Brett's Current Age Does Not Moot His Claims

Defendants argue that Brett was not protected by the IDEA after he graduated, and they assert that this case is moot because Brett is now 24 years old. Defendants' age-related mootness argument is based on Brett's current age, not his age at the time of the hearing officer's 1996 decision. The hearing officer found the 1996 case to be moot, not because Brett was then 19 years old, but because he had graduated. The state could have provided him a free appropriate public education at the time of the hearing officer's decision when Brett was younger than 22, had he not graduated.

Brett filed suit in federal court on June 19, 1997, his 20th birthday, and he is now 24 years old. His age exceeded the regulation's limit of 22 years old while this case was pending. In *Honig v. Doe*, 484 U.S. 305, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988), Doe filed suit seeking injunctive relief when he was a 17 year-old student. *Id.* at

312–14, 108 S.Ct. 592. The district court issued an injunction directing the school district to institute new policies involving certain types of disabled students. *Id.* at 315–16, 108 S.Ct. 592. By the time the case reached the Supreme Court, though, his case was moot because Doe had attained the age of 24 "and, accordingly, is no longer entitled to the protections and benefits of the [IDEA], which limits eligibility to disabled children between the ages of 3 and 21 . . . ." *Id.* at 318, 108 S.Ct. 592. It did not matter that Doe's case was not moot when it was filed or first appealed. *Id.* at 317, 108 S.Ct. 592. If *Honig* applied to this case, then Brett's claims would be moot because he is now 24 years old.

This case is distinguishable from *Honig* in a significant way. Unlike the plaintiff in *Honig*, Brett does not seek injunctive relief to correct future violations of the IDEA. Instead, he seeks compensatory relief for past alleged violations.[10] Brett cites *Pihl* to demonstrate the significance of this difference. The defendants in *Pihl*, which involved facts similar to the facts of this case, argued that that was moot based on *Honig*. *Pihl*, 9 F.3d at 189. In *Pihl*, as is the case here, the plaintiff sought compensation for past rights violations, not an injunction governing future conduct as was the case in *Honig*. *Id. Pihl* held that such compensatory claims were not moot. *Id.* at 189–90.

Although compensatory damages as generally understood are not available under the IDEA, *Charlie F.*, 98 F.3d at 991, *Pihl* described a remedy called "compensatory education." Citing *Zobrest v. Catalina Foothills School Dist.*, 509 U.S. 1, 4 n. 3, 113 S.Ct. 2462, 125 L.Ed.2d 1 (1993), as implicit support and the decisions of sever-

---

**10.** Complaint at 9 ("WHEREFORE, plaintiff requests all just and proper relief, including but not limited to remedial educational and related services, compensatory damages and attorney fees."); *id.* at 7, 8.

al circuits as explicit support, *Pihl* concluded that "a student who was deprived of services to which he was entitled under the IDEA has a right to a remedy, in the form of compensatory education, regardless of his eligibility for current or future services under the Act." *Pihl*, 9 F.3d at 189.

Compensatory education is a legal term used to describe future educational services that are awarded to compensate for a school district's failure to provide a free appropriate public education in the past. *Id.* at 187. Compensatory education is a remedy derived from a broad understanding of *Burlington School Comm. v. Massachusetts Dept. of Educ.*, 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). *Burlington* held that a court's power to grant relief under the IDEA "includes the power to order school authorities to reimburse parents for their expenditures on private school education for a child if the court ultimately determines that such placement, rather than a proposed IEP, is proper under the Act." *Id.* at 369, 105 S.Ct. 1996. Several courts of appeals including *Pihl* extended that holding to situations where parents were not in the financial position to fund a private school education for their children.

> Although students able to front the costs of an appropriate education later could claim reimbursement under *Burlington* and *Zobrest*, absent a compensatory education award, courts would be powerless to aid intended beneficiaries who were over twenty-one but who had not

sought out an alternative educational program.

*Pihl*, 9 F.3d at 189–90.

The Seventh Circuit explicitly adopted *Pihl*'s standard of compensatory education in *Board of Educ. v. Illinois State Bd. of Educ.*, 79 F.3d 654, 656 (7th Cir.1996):

> Although the [IDEA] entitles disabled individuals to special educational assistance only until they reach the age of 21, a number of courts have held that if the assistance is inadequate ..., the individual may be awarded, in order to cure the inadequacy, additional special assistance after he reaches the age of 21. The [IDEA] does not say so.... But it authorizes the court to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(e)(2), and these courts have assumed, consistent with the Supreme Court's generous reading of the provision in *School Comm. of Town of Burlington v. Department of Education*, 471 U.S. 359, 369–70, 105 S.Ct. 1996, 2002–03, 85 L.Ed.2d 385 (1985), that this authorization encompasses the full range of equitable remedies and therefore empowers a court to order adult compensatory education if necessary to cure a violation.... This is surely correct in light of the *Burlington* case....

(Citations to *Pihl* omitted).[11]

Accordingly, the fact that Brett is now 24 years old does not moot his case. The Court may award adult compensatory education if it is necessary and appropriate to cure a past violation of the IDEA. In addition, the Court may award compensa-

---

11. Several other circuits agree with *Pihl* and *Board of Educ. v. Illinois State Bd. of Educ. Burr v. Ambach*, 863 F.2d 1071, 1078 (2d Cir.1988), *vacated and remanded sub nom. Sobol v. Burr*, 492 U.S. 902, 109 S.Ct. 3209, 106 L.Ed.2d 560 (1989), *reaff'd on reconsideration, Burr v. Sobol*, 888 F.2d 258 (1989); *Lester H. v. Gilhool*, 916 F.2d 865, 872–73 (3d Cir.1990); *Hall v. Knott County Bd. of Educ.*, 941 F.2d 402, 407 (6th Cir.1991); *Miener v. State of Missouri*, 800 F.2d 749, 753 (8th Cir.1986); *Parents of Student W. v. Puyallup Sch. Dist. 3*, 31 F.3d 1489, 1496 (9th Cir. 1994); *Jefferson County Bd. of Educ. v. Breen*, 853 F.2d 853, 857–58 (11th Cir.1988).

tory damages pursuant to Brett's claims under the Rehabilitation Act, the ADA, and § 1983.

## B. Brett's Graduation Does Not Moot His Claims

Defendants argue that in addition to his current age, this case is moot because Brett graduated. Graduation as a limitation to benefits under the IDEA is different than a person's age as a limitation. By contrast, a person graduates, not due to the inevitable progress of time, but because one has earned enough credits in the required subjects. Defendants argue that graduation signifies accomplishment and equates to an appropriate education under the IDEA's free appropriate public education standard. The Defendants argue that graduation, as a sign of accomplishment, moots Brett's claims because he has already received the full benefit of a free appropriate public education under the IDEA.

Graduation is a particularly appealing ground for mootness in this case because, as will be explained below, Brett earned a bona fide diploma. He completed the required number of courses and learned the required material. "Children who graduate from our public school systems are considered by our society to have been 'educated.'" *Rowley*, 458 U.S. at 203, 102 S.Ct. 3034. However, the Supreme Court has refused to equate graduation with a free appropriate public education because it is possible for students to advance from grade to grade and graduate without receiving a free appropriate public education. Accordingly, although the arguments in favor of mootness are appealing in light of the particular facts and circumstances of Brett's education, the Court will not hold that this case is moot because Brett has graduated.

In reaching this conclusion, this Court looks to Supreme Court authority which does not equate graduation with mootness in all cases. *Zobrest* involved a student who had completed his studies and graduated from high school during the pendency of the litigation. *Zobrest*, 509 U.S. at 4 n. 3, 113 S.Ct. 2462. The Supreme Court held that the case was not moot since the student's parents sought reimbursement for the cost of the private interpreter they had hired to help their son graduate. *Id.* In addition, *Rowley* held that the "achievement of passing marks and advancement from grade to grade will be one important factor in determining educational benefit." *Rowley*, 458 U.S. at 207 n. 28, 102 S.Ct. 3034. Grade advancement is one important factor, but it does not equate with a free appropriate public education. *Id.* at 203 n. 25, 102 S.Ct. 3034 (explicitly refusing to hold that "every handicapped child who is advancing from grade to grade in a regular public school system is automatically receiving a 'free appropriate public education' "). *Accord Parents of Student W.*, 31 F.3d at 1494 (reaching the merits of a compensatory education award for student who graduated from high school).

Defendants cite *Yankton School Dist. v. Schramm*, 93 F.3d 1369 (8th Cir.1996), in support of their argument that a student's graduation moots his claims under the IDEA. But *Yankton* is distinguishable. *Yankton* did not involve the student's parents' claim that their daughter was entitled to compensatory special education after her graduation. *Id.* at 1377 n. 10. The issue of compensatory education after graduation was not before or addressed by the *Yankton* court.

*Yankton* is best understood, like *Honig*, as a case that involved injunctive relief governing future conduct. *Yankton* affirmed a district court order that directed the school district to provide special edu-

cation in the future. *Id.* at 1372. Since *Yankton* involved relief in the form of an injunction governing future conduct, it is analogous to *Honig* which held such claims to be moot, and not to the compensatory education cases which held such claims not to be moot.

*Board of Educ. of Oak Park v. Nathan R.,* 199 F.3d 377 (7th Cir.2000), is also distinguishable on these grounds. *Nathan R.* held that the parents' IDEA claims were moot since their son had graduated from high school. *Id.* at 381. The appeal in *Nathan R.,* as in *Yankton,* involved injunctive relief governing future conduct, not compensatory education.

Accordingly, the court concludes that Brett's case is not moot because his graduation *per se* does not necessarily equate with a free appropriate public education. Because neither his current age nor his graduation have mooted his claims, the Court must reach the merits of his claims to determine if he received a free appropriate public education.

## V. DEFENDANT'S ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE BRETT RECEIVED A FREE APPROPRIATE PUBLIC EDUCATION

### A. The Free Appropriate Public Education Standard

The IDEA requires states to provide a "free appropriate public education" to disabled students. To meet this goal, states must develop a specialized course of instruction for each disabled child that takes into account the child's individual capabilities and needs. 20 U.S.C. § 1415(b)(1)(C). The IEP is the written statement which sets out the educational program designed to meet the particularized needs of a child with disabilities. 20 U.S.C. § 1401(a)(20).

A multi-disciplinary team, or case conference committee, is comprised of educators and medical professionals with knowledge of a child's condition who are required to develop an IEP for the disabled child. 34 C.F.R. §§ 300.340–350. Once an IEP has been developed for a disabled child, the state educational agency must provide the special education and related services necessary to implement the IEP. A free appropriate public education is to be provided to the disabled child at no cost to the child's parents. 34 C.F.R. § 300.401.

The development and implementation of the IEP are the cornerstones of the IDEA. *Honig,* 484 U.S. at 311, 108 S.Ct. 592. The IEP must be reviewed periodically and revised if the plan is not meeting the child's needs. The multi-disciplinary team may convene and change a child's IEP, and the IDEA provides procedural protections to the parents of the child when a change occurs. Under the federal regulations, prior written notice to the parent or guardian of a handicapped child is required whenever the multi-disciplinary team proposes to initiate or change, or refuses to initiate or change, the identification, evaluation, or educational placement of the child. 34 C.F.R. § 300.504(a). In Indiana, parents or the child himself may appeal the multi-disciplinary team's decision to an independent hearing officer appointed by the state superintendent of public instruction. 511 IAC § 7–15–5.

■ A student has received a free appropriate public education when the state follows the procedural safeguards set out in the IDEA and the IEP offers instruction and supportive services "reasonably calculated to provide some educational benefit to the student for whom it is designed." *Rowley,* 458 U.S. at 201, 102 S.Ct. 3034; *Heather S. by Kathy S. v. State of Wisconsin,* 125 F.3d 1045, 1054

(7th Cir.1997). A state need not maximize the capabilities of the disabled child. *Rowley,* 458 U.S. at 198, 102 S.Ct. 3034.

## B. Brett Received a Free Appropriate Public Education

The Court will review each of Brett's procedural and substantive complaints about Defendants' handling of his education. Before doing so, though, it is important to note what is not at issue in this case. Brett admits that he is not bringing a claim relating to any of Defendants' actions that took place before January 1996. Plaintiff's Amended Response to Defendants' Motion for Summary Judgment at 7. Therefore, the Court will not discuss any of the criticisms directed at Defendants for actions taken prior to then.

### 1. Criticisms of the February 1996 IEP

■ Brett complains that upon his return to Goshen High School in 1996, his new IEP dramatically reduced the percentage of special education services from 100% to 4%. Brett argues that the inadequacies of the February 1996 plan caused him to miss class. He also alleges that the reduction in services was recommended without a psychological evaluation or a doctor's investigation.

Brett offers no evidence that the 4% special education services recommended in that IEP were not appropriate at the time the committee approved the plan. The written plan shows that the conference committee chose an educational plan from a number of options. It gives reasons for rejecting or accepting the proposed plan. Many options offering higher rates of special education services were rejected as too restrictive.

Brett does not dispute any of the reasons for accepting the chosen plan and rejecting the others. He does not offer an alternative educational plan that should have been chosen by the committee. Brett and his mother were members of the case conference committee and they approved the February 1996 IEP. He does not explain why he now views his approval of that plan to have been wrong. Without evidence, the Court finds no basis for a reasonable jury to conclude that the February IEP's recommendation of 4% special education services was inappropriate at the time the committee approved it.

Brett also argues that his failure to attend class after his father died shows that the IEP was inappropriate, even though the IEP was in effect for only three days before his father's death. It is speculative to conclude that the plan was inappropriate for him at the time it was prepared based solely on his failure to attend class. His father's death resulted in a significant and unforseen change of circumstances beyond the control of any of the parties. The Court finds no basis for holding Defendants liable for failing to recommend an IEP that would anticipate Brett's father's sudden death and be appropriate for Brett's changed emotional circumstances after the death. While the IEP became arguably unworkable after his father's death, Defendants were responsible to monitor Brett's progress and make changes. Defendants fulfilled this responsibility and took the necessary action, in less than a month's time.

■ The fact that Defendants prepared the February 1996 IEP without a doctor's evaluation of Brett's mental state may or may not be a procedural violation of the IDEA. Neither party provides authority for deciding whether a doctor's evaluation would have been procedurally required in this circumstance.[12] More importantly,

---

**12.** Hulecki testified that a doctor's evaluation was not required. Hulecki Deposition at 91.

however, "[p]rocedural flaws do not automatically require a finding of a denial of a [free appropriate public education]." *Heather S. by Kathy S. v. State of Wisconsin*, 125 F.3d 1045, 1059 (7th Cir.1997). Only those procedural flaws that result in loss of educational opportunity can be held to deny a student a free appropriate public education. *Id.* As explained above, it is speculative to conclude that the IEP was inappropriate at the time it was prepared. The committee designed the plan to meet Brett's goal to graduate. Defendants monitored Brett's changing circumstances and prepared a new IEP within a month when it became apparent that the IEP would not work for Brett after his father died, with input from numerous counselors and psychologists. The February 1996 IEP did not deprive Brett a free appropriate public education.

### 2. Criticisms of the March 1996 IEP

■ Brett next argues that the March 1996 IEP was inappropriate. That plan dramatically increased the recommended services from 4% special education services to 100% services, "which, on their face, were inadequate to provide an appropriate education for this troubled boy." Plaintiff's Amended Response at 10. Brett's mother objected and wrote on the form that her son should attend regular class instead of homebound instruction.

The undisputed facts do not support Brett's position with respect to the March 1996 IEP. The written IEP shows that the committee considered several less restrictive options and rejected them because all depended on Brett's attending class, which he was not doing. His stated goal remained to graduate as soon as possible. He agreed with the IEP's recommendation of homebound instruction at the time it was prepared. He regularly attended homebound instruction and earned his last few academic credits for graduation while under this plan.

The plan also addressed his emotional problems that had increased after his father's death. Defendants paid for Brett and his mother to attend the family counselor of their choice. Defendants had Zackheim reevaluate Brett approximately one month after the IEP took effect, and he concluded that Brett was "clearly better, but there are a number of areas that are still of concern." 4/17/96 Letter from Zackheim to Hulecki.

Defendants also permitted Brett to receive vocational services through the Vocational Rehabilitation office. Brett failed to take advantage of those services despite Defendants' numerous efforts to encourage his cooperation. No reasonable jury could view the increase in special education services as anything but the committee's response to Brett's changing circumstances. All of the evidence shows that Defendants' responsiveness was successful and appropriate.

### 3. Criticisms of His Graduation

■ Brett complains that Defendants graduated him just to get rid of him. He argues that Defendants never told him that he had the option of receiving a certificate of completion instead of a diploma. A certificate would allow him to continue receiving services beyond his 19th birthday.

There is no evidence that his graduation was a sham. Brett offers no proof that he did not earn the required number of credits, or that his teachers gave him better grades than he deserved, or that he gained far less knowledge than his peers. While it is true that he did not take the normal path to graduation—he attended four different high schools in five years, had constantly changing IEP's and emotional states, and had alternating periods of success and failure—overall he achieved the necessary requirements for graduation from high school. Brett graduated be-

cause he earned it, and there is no evidence to support the contention that Defendants graduated him to get rid of him.

The purpose of the IDEA is "to open the door of public education to handicapped children on appropriate terms." *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034. Before the IDEA, Brett would have received failing grades, been treated as a delinquent, and never received a diploma. Defendants provided him with individualized instruction, counseling and medical attention, and out of state residential education from the school of his choice, at no cost to him or his mother. He also had access to free vocational guidance and counseling, although he failed to use those services. Whenever his emotional state, or his or his mother's actions, deprived him of an educational opportunity, Defendants opened other doors designed to meet his needs. Brett earned enough credits to graduate from high school. The law does not require and the Court cannot demand any more of Defendants.

Brett argues that Defendants should have told him about the option of receiving a certificate and continuing services. Yet he provides no evidence that this option would have been better than the graduation option. He presents no evidence that Defendants precluded the conference committee from considering this option at either the February or March 1996 case conferences. Since graduation was appropriate, though, Mr. Brett's proposed alternative of a certificate plus continuing services can be rejected, even if it were the better option. The free appropriate public education standard does not require states "to maximize the potential of each handicapped child." *Rowley*, 458 U.S. at 200, 102 S.Ct. 3034. So long as graduation qualified as free appropriate public education—and no reasonable jury could conclude otherwise—Defendants fulfilled their legal obligations to Brett.

### 4. Criticisms of the Independent Hearing Officer's Findings

Brett claims that the denial of an administrative hearing violated his due process and procedural rights under the IDEA. Brett was scheduled to receive a due process hearing until his graduation intervened, and the independent hearing officer dismissed his request for a hearing as moot. As explained in Section IV above, this case is not moot due to the potential availability of compensatory education after graduation. Although the hearing officer should not have dismissed the request for hearing, this procedural error did not result in a denial of a free appropriate public education. Brett received five years of specialized education and earned the credits needed for graduation before the hearing officer dismissed the request. Thus, no violation of the IDEA or due process has occurred. *Heather S.*, 125 F.3d at 1059.

### VI. CONCLUSION

The Court holds that Defendants are entitled to summary judgment on all Brett's claims. The evidence established, and no reasonable jury could conclude otherwise, that the educational doors were wide open to Brett at every juncture and throughout every change in his circumstances. Whenever he stumbled, Defendants offered their assistance. Whenever he spurned the education that he had previously demanded, Defendants offered him a reevaluation and alternatives. When Brett demanded to graduate, Defendants found a way to assist him with his goal. In the opinion of the Court, the Defendants are to be commended, not criticized, for their efforts to provide Brett with a free appropriate public education. Their efforts exceeded to a significant degree what the law requires. Any failings are the responsibility of Brett in not taking

advantage of the numerous educational opportunities provided to him by the Defendants. Because no genuine issue of material fact exists, and the Defendants are entitled to judgment as a matter of law, the Court grants the Defendants' Motion for Summary Judgment.

For the foregoing reasons, the Court

A. **DENIES** Defendants' Motion to Strike [Doc. No. 52];

B. **GRANTS** Plaintiff's Motion for Leave to Supplement Plaintiff's Amended Response to Defendants' Motion for Summary Judgment with an Additional Exhibit [Doc. No. 57]; and

C. **GRANTS** Defendants' Motion for Summary Judgment [Doc. No. 52]. The Clerk is **ORDERED** to enter final judgment in favor of Defendants on all claims.

**SO ORDERED.**