**BOARD OF EDUCATION OF PAXTON–BUCKLEY–LODA UNIT SCHOOL DISTRICT NO. 10, and the Ford–Iroquois County Special Education Association, County of Ford, State of Illinois, Plaintiffs, Counter–Defendants,**

v.

**JEFF and Debbie S., as parents and next friends on behalf of ALEC S., a minor; and Illinois State Board of Education, Defendants, Counter–Plaintiffs.**

No. 00–2204.

United States District Court,
C.D. Illinois,
Urbana Division.

Feb. 13, 2002.

Merry C. Rhoades, Shayne L. Aldridge, Robbins, Schwartz, Nicholas, Lifton & Taylor, Decatur, IL, For Plaintiff.

Barry G. Lowy, Equip for Equality, Inc., Springfield, IL, For Defendants Jeff and Debbie S.

Jeffrey A. Shuck, Office of Illinois Attorney General, Springfield, IL, For Defendant ISBE.

## ORDER

McCUSKEY, District Judge.

This case arises under the Individuals with Disabilities in Education Act (IDEA), 20 U.S.C. § 1400 et seq. The underlying administrative proceeding against the Board of Education of Paxton–Buckley–Loda Unit School District ("the District") was commenced on behalf of Alec S., a child with profound hearing loss. The hearing officer found in favor of Alec S. On July 31, 2000, the District filed a Complaint (# 1) appealing the decision of the hearing officer to this court. On May 25, 2001, the parties filed cross-motions for summary judgment (# 29 & # 35). Following a careful review of the record in this case, Defendants' Motion for Summary Judgment (# 29) is GRANTED and Plaintiffs' Motion for Summary Judgment (# 35) is DENIED.

## BACKGROUND

Alec S., the son of Debbie S. and Jeff S., was born on July 27, 1995, and was diagnosed with profound hearing loss in both ears at thirteen months of age. Alec received hearing aids at that time and began receiving auditory verbal therapy (AVT)[1] from Dianne Hammes ("Hammes") of the Echo Program at the Carle Clinic and Mary Boucher Jones ("Jones"), a certified AVT therapist[2] in Indianapolis, Indiana.[3] Alec received a cochlear implant in February 1998. When a person receives a cochlear implant, that person does not automatically begin to hear sound like a person with an intact auditory system. Rather, the initial sounds that a person hears when receiving a cochlear implant are buzzes and clicks. AVT teaches those with hearing impairments to integrate the sounds and signals provided by the cochlear implant in order to better learn speech and to ultimately communicate verbally. Jones describes AVT as follows:

> If a student uses an auditory-verbal mode of communication, they receive the communication through their auditory sense. They develop the feedback mechanism to monitor their own speech production and learn how to produce speech sounds and language through naturally occurring events in the environment. There's no emphasis placed on any undue visual cues, and it's occurring under the same scope and sequence that normal speech and language development would occur with all of those

1. A hearing impaired student also has the option of receiving the following speech and language services: auditory/oral, American sign language, total communication, and cued speech.

2. To become a certified auditory verbal therapist, the candidate must provide letters from parents of children that the clinician has worked with, a letter from a certified auditory verbal therapist, a letter from a supervisor in

the program describing the type of programming the individual is working in and completion of a 2400 hour practicum period.

3. Hammes is a speech-language pathologist. Hammes has not yet been certified as an auditory verbal therapist. Jones has a masters degree in speech pathology. Jones has worked for twenty five years with hearing impaired children and has worked with approximately 2,500 children.

things happening concurrently and blending together.

As part of AVT, therapists assess the "map" of a cochlear implant and provide diagnostic information to audiologists for the purpose of adjusting the implant. There is a critical window of opportunity for a child with a cochlear implant to learn to hear and speak during which AVT is implemented.[4] In order for AVT to be effective, the recipient must be placed in a regular education classroom setting with typically developing peers where he will be exposed to normal speech and language patterns. Another aspect of AVT is that parents and siblings of children receiving AVT participate in the therapeutic process. AVT is implemented 24 hours per day and integrated into the daily life of the child's family.

Until Alec turned three, he was receiving services under an Individualized Family Service Plan (IFSP). Debbie has chosen AVT as the therapy she preferred Alec to receive. The IFSP called for Alec to receive AVT[5] services one hour per week from Hammes and two hours per month from Jones. The IFSP also called for Alec to "participate in a center based program that includes normally developing children." Prior to the time Alec turned three, Debbie contacted Cliff McClure, principal of the Clara Peterson Grade School, to request services. Debbie contacted McClure by telephone in February 1998 and completed a referral form for special education services on March 5, 1998. On the referral form, Debbie checked boxes indicating a need for speech, hearing, and social development services. At this time, McClure gave Debbie a "Notice of Parent's Rights." The form was outdated, however, and was silent on the issue of placement by parents in a private school not approved by the local educational agency.[6]

McClure had Debbie sign a consent form to allow the District to perform its initial case study evaluation of Alec. The form indicated that Alec would receive comprehensive and speech/language case study evaluations. A comprehensive case study evaluation is supposed to include a social development study, a medical history report, a review of academic history, and an assessment of the child's learning environment. In April 1998, the District performed a Psychoeducational evaluation and a Social Development Study of Alec. The Psychoeducational evaluation indicated that Alec's academic skills fell within the below average to high average range compared to same age peers. The Social Development Study was conducted by Lisa Combes. Combes spoke with Debbie about potential placements for Alec, and Debbie informed Combes that Alec should be placed in a normal preschool setting. Debbie informed Combes that Alec would be turning three over the summer. Combes told Debbie that there was a program for three to five-year-olds offered at Westlawn school. Debbie went to Westlawn school and believed, based upon her observations, that the children in the class were disabled and many exhibited disabilities with regard to their speech.

Debbie then began searching for preschool placements for Alec. Other than the

4. Jones testified that AVT can also be implemented on older individuals if the auditory nerve has been stimulated and the pathways are still open.

5. Debbie had filed for a due process hearing after the Developmental Services Center administering the IFSP indicated it could not provide AVT. The matter was settled before it went to hearing, and Debbie was reimbursed for the AVT therapy received by Alec.

6. This was the only "Notice of Parent's Rights" provided to Debbie prior to the Multidisciplinary Conference (MDC) held on August 27, 1998.

Westlawn school, there are two private preschools operated in Paxton, Illinois, where Alec resides. Debbie visited both preschools. One of the preschools was located in the basement of a church. Debbie did not feel that the basement would be acoustically appropriate for Alec. Therefore, she reserved a placement for Alec at St. John's preschool prior to the beginning of the 1998/1999 school year. Alec was also continuing to receive AVT services from Hammes and Jones.

The District has policies relative to the transition of children from Part C to preschool programs. Part C is an early intervention program for children ages 0 to 3. At age three, Alec should transition from the Part C program to a Part B program designed for children ages 3 to 5. The District has policies regarding the development of an Individualized Education Program (IEP) which state that an "IEP or IFSP will be developed for any child referred for a case study evaluation and found to be eligible within at least 60 days prior to their [sic] third birthday to be implemented on the third birthday." The policy further states that "Each initial IEP must be completed by the IEP team no later than 30 days after the determination of eligibility and in no case later than 60 school days from the date of referral."

The evaluations conducted by the District were completed by April 20,1998. As a result of these evaluations, the District had determined that Alec was eligible for services. An IEP was not developed within 30 days of this evaluation. Neither did the District develop an IEP for Alec prior to May 27, 1998, which is 60 days prior to his third birthday. Furthermore, the District did not prepare an IEP within sixty

school days of March 5, 1998, the day Debbie signed the referral form.[7] Rather, the Multidisciplinary Conference (MDC) to develop an IEP was not held until August 27, 1998.

The Psychoeducational evaluation and a Social Development Study were the only evaluations conducted by the District prior to the first MDC held on August 27, 1998. Prior to the MDC, the District also failed to perform a hearing screening. Neither had the District's speech pathologist done any testing of Alec as required for a speech and language case study evaluation. Rather, the District relied upon the testing conducted by Alec's private therapists for test results. Furthermore, the District had not reviewed Alec's records from his IFSP prior to the MDC.

At the IEP meeting held on August 27, 1998, the District found Alec eligible for special education and related services as a hearing impaired student. In preparing the IEP, the District set a number of goals for Alec. These goals included increasing social language, increasing auditory skills, and achieving age-appropriate communication skills.[8] The District offered Alec an educational placement in the Early Childhood Special Education class at the Westlawn school along with speech and language and itinerant hearing impaired teacher services. At the IEP meeting, Debbie requested a regular preschool placement. The District refused to place Alec in a preschool class other than the one it offered at Westlawn. Debbie rejected the placement because she did not believe that Westlawn would provide appropriate language models which is necessary as part of Alec's AVT. Therefore, Debbie

7. The last day of the school year was June 2, 1998. The number of school days from March 5, 1998, when Debbie signed the consent form, until the end of the school year was 60 school days.

8. Jeff and Debbie S. did not object to these goals forming the basis of an IEP for Alec.

advised the District that she had reserved a spot for Alec at St. John's preschool and intended to place him there without the District's consent.[9]

Jones and Hammes were also in attendance at the MDC to discuss AVT with the District. They indicated that Alec was receiving AVT therapy regularly at Carle Clinic and twice monthly with Jones for one hour periods. Hammes presented her report at the MDC recommending that Alec continue to receive AVT because "his ability to process language auditorily continues to improve as he and his family work to develop his auditory and feedback systems." Jones also presented her latest progress report for Alec, indicating:

> It is critical that Alec have consistency in his therapy program at this critical juncture in his development. Changing service providers or methodology at this point could be extremely detrimental to his progress. All of Alec's therapists and teachers should know how to troubleshoot cochlear implants as well as [have] knowledge of auditory-verbal techniques.

Despite these reports, the District refused to provide an AVT therapist for Alec and declined to pay Jones or Hammes for AVT rendered to Alec.

The District did, however, provide Alec with the IDEA's requirements of services to privately enrolled students. Specifically, the District offered the services of Al Bowman, its speech pathologist, to provide services to Alec twice weekly in one-half hour sessions. Bowman agreed to learn about AVT and incorporate elements of AVT into his management of Alec's case.

Bowman had never worked with a cochlear implanted child, nor is Bowman trained or certified as an auditory verbal therapist. Debbie testified that she decided to give Bowman a chance because "he was very interested in the concept and wanting to try auditory-verbal and learn about it."

Bowman worked with Alec from September 15, 1998, to January 14, 1999.[10] Bowman treated Alec with a traditional speech-language model using auditory-oral philosophy.[11] During this time he collaborated with Jones via email in an attempt to incorporate AVT into his practice. In one of these emails, Bowman stated:

> I saw Alec for the first time today, and now understand why you and your team were so excited about his potential as an oral communicator. Considering how little time has elapsed since the implant surgery, his progress has been nothing short of remarkable. I can't imagine anyone even considering signing or "traditional" auditory training with a child like this.

Debbie terminated Bowman's services because she felt that Alec had not progressed, but was in fact regressing as a result of Bowman's therapy. Hammes testified that, following Bowman's treatment, Alec regressed in his ability to stay on task for a one hour AVT session and had lost some of his natural intonation patterns which had been developed prior to Bowman's involvement. Jones testified as follows regarding the effects of Alec receiving treatment from Bowman:

> There was some regression of some patterns, like his intonational pattern be-

---

9. St. John's is a parochial pre-school program which does not provide any special education services. The curriculum includes instruction in the Lutheran religion.

10. During this time, Alec was still receiving treatment from Jones.

11. The auditory-oral philosophy emphasizes the development of speech by using both auditory and visual cues with some specific training for developing auditory pathways. There is also training to use speech reading and other visual cues.

came stilted. If you pardon the expression, he sounded more like he was speaking with deaf speech which has a tendency to be more monotone.... The other thing I noticed too is it was very difficult to get him back to what we call a listening focus, to listen, to be able to work on processing those patterns....
In additional to the intonation pattern and the listening set, he started kind of segmenting his vocalization. Like he was at that point, prior to when he was starting with Al, he was starting to put two words together, combining some of the words that he knew and even putting some phrases together. Well, he started getting some of the word order confused.

Hammes conducted testing of Alec following Bowman's treatment. The Ski–Hi test indicated that Alec made gains in one area and maintained in another area between October 1998 and February 1999. The expressive one word picture vocabulary test results demonstrated some gains as well. In a report dated February 2, 1999, Hammes indicated that "Alec's overall expressive and receptive language levels continue to meet or exceed his hearing age of 30 months."

The IEP team met for Alec a second time on May 24, 1999. The District's only offer of placement at this meeting was a self-contained classroom for the hearing impaired. If Alec would have been placed in this classroom, he would not have had speech modeling from nondisabled peers. Debbie again refused the placement and asked the District to pay for Alec to be educated at St. John's preschool. Alec's IEP was not completed at this meeting, and the meeting was postponed until September 1999.

The subsequent meeting was held on September 16, 1999.[12] Michelle Hall Bolden, a parent's advocate, attended this meeting with Debbie. The 1999 IEP also contained goals of increasing Alec's listening skills, increasing his expressive and receptive language skills, achieving age appropriate communication skills, as well as producing age-appropriate phonological process. At this meeting, the District offered the PREP/At–Risk class as a placement for Alec in addition to the early childhood program it previously offered. The PREP program is a District program for non-special education students who may be behind in normal developmental areas that would cause them to not have an equal chance when they arrive in kindergarten. The program meets four days per week and the students attend either the morning or the afternoon portion of the program. Subsequent to the meeting, Debbie and Bolden visited the PREP program. The IEP meeting was resumed on September 28, 1999. Debbie rejected the PREP placement because it was her belief, as well as Bolden's belief, that the children in that classroom would not provide Alec sufficient interaction with children exhibiting proper speech modeling.

Due to the District's decision not to fund Alec's placement at St. John's and his AVT therapy, Jeff and Debbie requested a due process hearing on October 8, 1999. On March 2 and 3, 2000, the parties presented their cases to Stacy Stutzman, the special education due process hearing officer. On April 24, 2000, the hearing officer issued her order finding in favor of Alec and his parents. The hearing officer ordered the District to pay for the costs of Alec's therapy from Hammes twice per week and from Jones for two hours per month in the

12. The IEP form has columns for listing the student's strength and weaknesses. On Alec's form developed at the meeting, only information regarding his deficits was recorded on the form.

amount not covered by Jeff and Debbie's insurance until an IEP is convened where Hammes and Jones recommend a change in the services. The hearing officer further ordered that Alec be placed in a private preschool at the District's expense and ordered reimbursement to the Jeff and Debbie in the amount of $2,326.20 (which includes preschool tuition and Hammes' charges not covered by insurance).

## ANALYSIS

The standard under which this court must consider the parties' cross motions for summary judgment differs from the typical determination on motions for summary judgment. Although it is termed summary judgment, this court's decision is based upon a preponderance of the evidence. *Heather S. v. State of Wis.,* 125 F.3d 1045, 1052 (7th Cir.1997). The party challenging the outcome of the administrative proceeding, in this case the District, bears the burden of proof. *Heather S.,* 125 F.3d at 1052. The district court is required to give "due weight" to the findings from the administrative proceeding and is "not to substitute its judgment for that of the administrative hearing officer's." *Board of Educ. of LaGrange Sch. Dist. No. 105 v. Ryan B.,* 184 F.3d 912, 915 (7th Cir.1999). "Due weight necessarily implies some sort of deference to the agency's decision, and considering the officer's special expertise in education law, ... a sound basis exists for giving deference to the decisions of hearing officers." *Heather S.,* 125 F.3d at 1053.

### A. Violations of the IDEA's Procedural Safeguards

■ Under the IDEA, a disabled child is entitled to a free appropriate public education (FAPE). 20 U.S.C. § 1400(d). "A free appropriate public education is one specially designed to meet the unique needs of the handicapped child, supported by services as are necessary to permit the child to benefit from the instruction."

*Board of Educ. of Murphysboro Comm. Unit Sch. Dist. No. 186 v. G.S.,* 41 F.3d 1162, 1166 (7th Cir.1994). In order to provide FAPE, the District must (1) follow the procedures set forth in the IDEA and (2) "develop an IEP through those procedures that is reasonably calculated to enable the child to receive educational benefits." *Murphysboro,* 41 F.3d at 1166. "Once the school district has met these two requirements, the courts cannot require more; the purpose of the IDEA is to open the door of public education to handicapped children, not to educate a handicapped child to his highest potential." *Murphysboro,* 41 F.3d at 1166.

Defendants first argue that the decision of the hearing officer should be upheld because the District's violations of procedural safeguards denied Alec a FAPE. The hearing officer was very critical of the procedural violations committed by the District in finding for Alec, stating:

> Parents came to District seeking special education and related services from the District for their hearing impaired child and signed a consent for a case study evaluation nearly five months prior to Student's third birthday. Parents were given an out-of-date, inaccurate copy of their procedural rights by the District. The District completed its evaluation, consisting only of a psychological and social/developmental study in mid-April of the 1997–98 school year, and yet, without explanation did not convene an MDC until the end of August, 1998. The child therefore turned three without an IEP or IFSP from the District, and the school year began without an MDC or an IEP to implement.

This court agrees that the District committed several violations of procedural safeguards with regard to the development of Alec's IEP. 20 U.S.C. § 1414(d)(2)(A) requires that:

At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in its jurisdiction, an individualized education program as defined in paragraph (1)(A).

In this case, the MDC was not held until August 27, 1998, after the beginning of the school year. In addition, the Illinois Administrative Code governing special education states that an MDC shall be completed within 60 school days of the date of referral. 23 Ill. Adm.Code § 226.110. The District admits that no MDC was held within 60 school days of the referral. Finally, 23 Ill. Adm.Code § 226.260 requires that "[f]or each child who will be making the transition from an early intervention program into the special education program of a school district at age three, the district shall ensure that either an IEP or the child's IFSP is in effect on his or her third birthday." Alec's third birthday occurred on July 27, 1998. The MDC to develop the IEP was not held until a month later. Neither did the District implement or offer to implement the IFSP prior to the beginning of the school year.[13]

The District argues that delaying the MDC until August 1998, after Alec turned three and after the beginning of the school year, was not a significant violation of the IDEA's procedural safeguards. The District admits that the sixty days expired on June 1, 1998. The last day of school was June 2, 1998. Therefore, the MDC, while held on August 27, 1998, took place only five days beyond the mandated 60 school days. While five days might be considered de minimus in other circumstances, the five day delay in the instant case could have resulted in a serious educational obstacle for Alec during a critical period of time in the implementation of his cochlear implant. Prior to August 27, Debbie did not know whether the District would provide an appropriate placement for Alec. In fact, prior to the MDC, Debbie was shown only one placement option—a placement with disabled peers. This left Debbie in a precarious position. As the hearing officer aptly pointed out:

> The child therefore turned three without an IEP or IFSP from the District, and the school year began without an MDC or an IEP to implement. The parents in this case did the responsible thing for their child by having a place reserved and enrolling him in the preschool his brother attended and that [Alec] would likely have attended were he not disabled and continuing in the Auditory Verbal Therapy program he had been in since diagnosis of his hearing impairment at the recommendation of the professionals who had been continually working with him and his Parents.

Further, the District gives no indication why it could not develop Alec's IEP before August 1998 as both evaluations it performed were completed in April. Again in 1999, the MDC was not completed until September 28, well after the beginning of the school year.

With regard to the outdated parents' rights handbook distributed to Debbie, the District argues that it offered Debbie a handbook at each IEP meeting. Further, the District contends Debbie was obviously aware of her rights because she filed for a due process hearing. However, the only handbook Debbie received prior to the August 27, 1998, MDC did not inform her of her duty to give the District notice of unilateral placement. 20 U.S.C. § 1415(d)(2)(H) requires the District to

---

**13.** In the case of a program for children aged three through five, and IFSP can serve as the IEP if it is consistent with State policy and agreed to by the agency and the child's parents. 20 U.S.C. § 1414(d)(2)(B).

"include a full explanation of procedural safeguards ... relating to the requirements for unilateral placements by parents of children in private schools at public expense." The District failed to provide this full explanation by providing an outdated handbook. This court agrees with the hearing officer that the District's violations of the procedural safeguards established by the IDEA, particularly its delay in developing an IEP for Alec prior to August 27, 1998, and prior to September 28, 1999, was significant and denied Alec a FAPE.[14]

### B. Placement in the Least Restrictive Environment (LRE)

■ The IDEA creates a strong preference in favor of "mainstreaming" or insuring that handicapped children are educated with non-handicapped children to the extent possible. *LaGrange*, 184 F.3d at 915. The IDEA's implementing regulations provide that "children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are nondisabled." 34 C.F.R. § 300.550(b)(1). Furthermore, children with disabilities are only to be removed from regular education classes "if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 34 C.F.R. § 300.550(b)(2). The commentary to this regulation also states:

Public agencies that do not operate programs for nondisabled children are not required to initiate such programs to satisfy the requirements regarding placement in the LRE embodied in Sections 300.550–556. For these public agencies, some alternative methods for meeting the requirements include (1)

Providing opportunities for participation (even part time) of preschool children with disabilities in other preschool programs operated by public agencies (such as Head Start); (2) Placing children with disabilities in private school programs for nondisabled preschool children or private preschool programs that integrate children with disabilities and nondisabled children; and (3) Locating classes for preschool children with disabilities in regular elementary schools. In each case the public agency must ensure that each child's placement is in the LRE in which the unique needs of that child can be met, based on the child's IEP . . . .

*LaGrange*, 184 F.3d at 915–16.

At the MDC held in August 1998, both Jones and Hammes informed the District that as part of Alec's AVT, it was essential that he be placed in a regular classroom. Alec's IFSP indicated that he should "participate in a center based program that includes normally developing children." The IEP developed at the August meeting stated that Alec "would really benefit from interaction with his hearing peers." Despite these facts, the District offered only a placement in the Early Childhood Special Education class, a self-contained special education classroom, in August 1998. At the September 1999 MDC, the District offered the PREP program. The PREP program is a District program for non-special education students who may be behind in normal developmental areas that would cause them to not have an equal chance when they arrive in kindergarten. The District argues that this is a regular education preschool. However, Eric Brackmann, the program coordinator for

14. The District devotes a large portion of its argument to whether it was required to provide educational services to Alec during the summer months. This court does not construe Defendants' motion to make such an argument. Therefore, it finds the District's argument without merit.

the Ford Iroquois County Special Education Association, testified that he was not aware of any regular preschool classrooms. Brackmann described the students in the PREP program as being "behind in normal developmental areas that would cause them not to have an equal footing when they came into kindergarten." Chris Locher, the regional coordinator of hearing services for the Central Affiliation for Special Education, stated that she felt the PREP program would be appropriate for Alec because "he would get an opportunity to be with similar age peers who are working on talking and listening just like he is." This court agrees with the hearing officer that the PREP program cannot be considered the LRE because "the evidence shows that [Alec] can be educated in a regular preschool classroom with nondisabled children and with few modifications to the curriculum." Therefore, this court agrees with the hearing officer that the PREP program and the Early Childhood Special Education class were not a FAPE for Alec within the meaning of the IDEA because the programs did not provide the LRE to meet his educational needs.[15]

### C. The District's Discretion to Choose the Method of Service Delivery

■ Relying on *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir. 1988), *cert. denied*, 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988), the District argues that the decision of the hearing officer must be reversed because it is within the discretion of the District to choose the appropriate method of service delivery. In *Lachman*, the primary disagreement between the parents and the school district centered on whether Benjamin, a deaf child, should receive education through the cued speech technique or the total communication concept. The parents argued that the IEP proposed by the school district would not provide Benjamin an education in the LRE.

The court initially noted that "once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the State." *Lachman*, 852 F.2d at 294, *quoting Board of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). The IDEA provides that "[t]he primary responsibility for formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs" is left to "state and local educational agencies in cooperation with the parents or guardians of the child." *Lachman*, 852 F.2d at 296. The *Lachman* court determined that the issue of mainstreaming was subsumed by the parties' disagreement as to the methodology to be employed in educating Benjamin, stating:

> The Lachmans' contention that their son can be fully mainstreamed rests squarely on their belief in, and preference for, the cued speech technique. They do not maintain that the fully-mainstreamed placement they seek would be possible without the use of cued speech and the utilization of a cued speech instructor working at Benjamin's side, full-time, in the classroom. Further, [the parents] do not claim that Benjamin could be mainstreamed to any greater extent than called for in the proposed IEP, if the total communication methodology is utilized. The reasons relied on by the school district for refusing to place Ben-

---

15. The Defendants further argue that the District denied Alec FAPE by refusing to provide necessary assistive technology in the form of AVT. Because this court has already deter- mined that the District denied FAPE due to substantial violations of the IDEA's procedural safeguards and by failing to place Alec in the LRE, the court needs not reach this issue.

jamin in a regular classroom full-time focus on its lack of confidence in the cued speech technique as a means for facilitating immediate, full mainstreaming in Benjamin's case. Instead, the school district believes that the total communication concept is the most appropriate way to facilitate Benjamin's early primary education and it has selected that methodology for his IEP. *Lachman*, 852 F.2d at 296. The court, therefore, found in favor of the school district because the record did not indicate that the IEP would not provide an education in a regular classroom environment to the maximum extent appropriate. *Lachman*, 852 F.2d at 297.

In the instant case, the issue of mainstreaming is not subsumed by the parties' disagreement over the methodology. Rather, AVT requires that Alec be included in a regular classroom so that he can hear appropriate peer speech modeling. The programs proposed by the District were not in regular classrooms and could not provide the necessary modeling. Therefore, unlike in *Lachman*, Alec will be mainstreamed to a greater extent through implementing AVT. Furthermore, the District presented no evidence below that its proposed therapy would as effectively place Alec in the LRE if he was given time to adapt to a different therapy proposed by the District.

In *Lachman*, the court found nothing in the record to indicate that the school district's proposed IEP would prevent the student from being educated in the LRE. *Lachman*, 852 F.2d at 297. That is not the case here. As the hearing officer below pointed out, "the District simply chose not to consider any type of regular preschool program in determining placement for [Alec]." In addition, in *Lachman* the

parents did not allege that the school district violated any of the IDEA's procedural safeguards. *Lachman*, 852 F.2d at 293. In the instant case, as discussed above, the District substantially violated several such safeguards. Finally, *Lachman* is distinguishable from the instant case because the hearing officer in the *Lachman* case had found for the school district. In this instant case, the hearing officer found for the parents. This court is required to give due weight to that finding. *LaGrange*, 184 F.3d at 915. Therefore, this court agrees with the hearing officer that "AVT is required in order for [Alec] to learn to listen and speak and ultimately communicate in an age appropriate manner [and] certainly necessary in order to receive a satisfactory education."[16]

### D. Services Ordered by Hearing Officer Provide FAPE

■ The District next argues that the services ordered by the hearing officer do not provide a FAPE to Alec. The District contends that providing AVT to Alec could be detrimental to his future development because AVT is not a widely accepted practice or the best method for educating children with hearing loss. It advances two primary arguments to support this contention: (1) the hearing officer erred by giving weight to the testimony of Hammes and Jones at the due process hearing; and (2) evidence obtained after the due process hearing indicates that "Alec was not making expected educational gains, and, in fact, is falling farther and farther behind his same age peers and is lagging in progress with respect to his cognitive potential."

First, the District argues that the hearing officer should have applied *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579,

---

**16.** The hearing officer found evidence supporting this position credible and found no compelling evidence to the contrary.

113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) to disregard the testimony of Hammes and Jones. There are many flaws to this argument. Initially, this court is aware of no provision in the IDEA which requires a due process hearing officer to apply the *Daubert* standard to the due process hearing. Furthermore, the District failed to make this argument before the hearing officer and this court, therefore, considers the argument waived. The supplemental record indicates that the District filed motions in limine, but none dealt with the issue of Hammes' and Jones' qualifications to testify at the due process hearing.

It should be further pointed out that the District did not always question the opinions of Hammes and Jones. The District chose to rely exclusively upon their opinions and testing in 1998 regarding Alec's hearing loss. Furthermore, Al Bowman, the District's speech pathologist, collaborated with Jones in an attempt to learn about AVT and incorporate it into his treatment of Alec. In one of his many emails to Jones, Bowman stated: "Considering how little time has elapsed since the implant surgery, his progress has been nothing short of remarkable. I can't imagine anyone even considering signing or 'traditional' auditory training with a child like this."

■ Second, the District offers new evidence in an attempt to demonstrate that AVT is not meeting the goal of providing Alec with a FAPE. The IDEA states that the district court "shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B). However, the court need not accept all evidence offered by a party in an IDEA proceeding. *Monticello Sch. Dist. No. 25 v. George L.,* 102 F.3d 895, 901 (7th Cir.

1996). "[T]he determination of whether to allow additional evidence under § 1415(e)(2) 'must be left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial de novo.'" *Monticello,* 102 F.3d at 901, *quoting Town of Burlington v. Department of Educ.,* 736 F.2d 773, 791 (1st Cir.1984), *aff'd,* 471 U.S. 359, 105 S.Ct. 1996, 85 L.Ed.2d 385 (1985). "[A] court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of the administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the [evidence was not available at the administrative hearing], and conservation of judicial resources." *Board of Educ. of Arlington Heights Sch. Dist. No. 25 v. Jamie H.,* 2001 WL 585149 at *3 (N.D.Ill.2001), *quoting Burlington,* 736 F.2d at 791. "A lax interpretation of additional evidence would reduce the proceedings before the state agency to a mere dress rehearsal by allowing appellants to transform the Act's judicial review mechanism into an unrestricted trial de novo." *Springer v. Fairfax County School Board,* 134 F.3d 659, 667 (4th Cir.1998).

The District has attached a number of exhibits to its Motion for Summary Judgment. A significant portion of these materials consists of testing performed on Alec to evaluate the effectiveness of AVT on Alec's performance. These test results were not a part of the administrative record nor presented to the hearing officer. The District felt it unnecessary to test Alec in 1998 in order to prepare an appropriate IEP. Now, years later and after the due process hearing, the District has suddenly decided to take an interest in the "progression of Alec's educational career." This court believes that the attempt of the District to introduce these results at this time severely undercuts the role of the

hearing officer and her expertise. "Hearing officers have much greater expertise in educational policy, and judges should not second-guess them." *Arlington Heights,* 2001 WL 585149 at *4. Unfortunately, the District felt it unnecessary to attempt to present such evidence to the hearing officer and deprived this court of the hearing officer's expertise on this matter. Furthermore, the District has saved what it may consider its best evidence until this late stage in the proceedings, resulting in unfairness to Defendants.[17] Therefore, this court believes it would be inappropriate to consider the new evidence supplied by the District.

### E. Reimbursement

■ 34 C.F.R. § 300.403 provides that, in general, a District is not required to pay for private school placements. However, there are exceptions to this general rule. 34 C.F.R. § 300.403(c) provides:

> If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool ... without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate.

Once these criteria are met, "a district judge has the discretion to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately determines that such placement, rather than a proposed IEP is proper under the [IDEA]." *Linda W. v. Indiana Dept. of Educ.,* 200 F.3d 504, 506 (7th Cir.1999), *cert. denied,* 531 U.S. 816, 121 S.Ct. 53, 148 L.Ed.2d 22 (2000). Furthermore, reimbursement is not an entitlement, and the discretion granted to the court in awarding reimbursement is "broad." *Linda W.,* 200 F.3d at 507.

Alec was receiving services under an IFSP prior to seeking services from the District. Debbie reserved a spot for Alec at St. John's in March 1998, pending the outcome of the MDC. At the IEP meetings, Debbie rejected the District's proposed placements because she did not believe that they would provide appropriate language models which is necessary as part of Alec's AVT. Therefore, Debbie advised the District that she had reserved a spot for Alec at St. John's preschool and intended to place him there without the District's consent. Furthermore, as discussed above, the MDC was not held in a timely fashion,[18] nor was the IEP appropriate. Thus, the District did not make "FAPE available to the child in a timely manner prior to the enrollment." 34 C.F.R. § 300.403(c). Pursuant to 34 C.F.R. § 300.403, the only remaining consideration is whether the placement was appropriate. The record indicates that Alec receives interaction with typically speaking peers at St. John's, a requirement to effectively implement AVT. Alec's

---

**17.** The Amended Discovery Order entered in this case provided that the parties were to tender to each other all proposed documents for supplementing the administrative record by December 27, 2000. By February 12, 2001, the parties were to prepare a stipulation as to the supplemental exhibits. The parties were to submit a motion to supplement if the parties failed to reach a stipulation as to any exhibits within thirty days of that stipulation. The stipulation was filed on May 3, 2001. No motions to supplement were received by the court.

**18.** The District states that the MDC was held prior to the first day of the District's preschool classes. However, there is no support in the record for this statement.

preschool teacher testified that Alec benefits "speaking-wise" from being in her class. Furthermore, Jones testified that St. John's was the appropriate placement for Alec. Thus, this court concludes, in the exercise of its discretion, that the hearing officer properly ordered the District to reimburse Defendants for the costs associated with Alec's placement at St. John's.[19]

### F. Payment for AVT Services

 The hearing officer ordered the District to pay the costs of Alec's AVT therapy from Hammes and Jones in the amount not covered by the parents health insurance policy "until such time as an IEP meeting is convened wherein [Hammes and Jones] recommend a change in or discontinuation of services." The District argues that this provision of the order ties the District's hands in that it must hold yearly IEP meetings to review goals and objectives. However, the private therapists have the final word regarding services to be rendered. Plaintiffs concede that "nothing in the ruling precludes the District from requesting due process if it disagrees with the conclusion of Hammes or Jones on Alec's need for AVT after it has undertaken to write a fully individualized IEP for Alec."

The IDEA allows the court to "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B)(iii). This court agrees with the parties that the District should have recourse should it disagree with the decisions made by Hammes and Jones regarding the necessity of continuing AVT services for Alec. Therefore, the order of the hearing officer is modified to state that the District has a right to file for a due process hearing if it disagrees with the conclusions of Hammes and Jones on the need for AVT services after an IEP is developed.

IT IS THEREFORE ORDERED:

(1) Defendants' Motion for Summary Judgment (# 29) is GRANTED.

(2) Plaintiffs' Motion for Summary Judgment (# 35) is DENIED.

(3) The order of the hearing officer is modified to state that the District has a right to file for a due process hearing if it disagrees with the conclusions of Hammes and Jones on the need for AVT services after an IEP is developed.

(4) The District is ordered to reimburse Jeff and Debbie S. in the following amounts:

(a) $2,326.20 as ordered by the hearing officer, comprised of $765 for preschool tuition through April 30, 2000, and $1,561.20 for Hammes' substantiated charges not covered by insurance.

(b) $845 as payment for the costs of Alec's therapy from Jones as ordered by the hearing officer and as documented by Exhibits RRR 0001–003 to the Supplemental Record.

(c) $2,161 as payment for the costs of Alec's therapy from Hammes as ordered by the hearing officer and as documented by Exhibits RRR 005–009 of the Supplemental Record.

(d) Reimbursement for 1990–2000 school year as ordered by the hearing officer upon tender of proof of payment of these expenses.

(5) This case is terminated.

---

19. The District further argues that providing reimbursement to Alec's parents for his preschool education at St. John's, a parochial school, would violate the Establishment Clause of Constitution. This court agrees with the reasoning of the courts in *Matthew J.* *v. Massachusetts Dept. of Educ.,* 989 F.Supp. 380, 391–92 (D.Mass.1998) and *Christen G. v. Lower Merion Sch. Dist.,* 919 F.Supp. 793, 817–20 (E.D.Pa.1996) and finds this argument without merit.

(6) Defendants are allowed thirty (30) days to submit a petition for attorney fees and costs, along with supporting affidavits and itemized lists of time expended by each attorney claiming fees.